# GRUPO MEXICANO DE DESARROLLO, S. A., ET AL. *v.* ALLIANCE BOND FUND, INC., ET AL.

No. 98–231.   Argued March 31, 1999—Decided June 17, 1999

SCALIA, J., delivered the opinion for a unanimous Court with respect to Part II, and the opinion of the Court with respect to Parts I, III, and IV, in which REHNQUIST, C. J., and O'CONNOR, KENNEDY, and THOMAS, JJ., joined. GINSBURG, J., filed an opinion concurring in part and dissenting in part, in which STEVENS, SOUTER, and BREYER, JJ., joined, *post*, p. 333.

*Richard A. Mescon* argued the cause for petitioners. With him on the briefs were *Scott S. Balber* and *Peter Buscemi.*

*Drew S. Days III* argued the cause for respondents. With him on the brief were *Kenneth W. Irvin, Dale C. Christen-*

sen, Jr., John J. Galban, Jeremy G. Epstein, Stephen J. Marzen, Meredith Kolsky Lewis, Andrew J. Wertheim, and Lisa T. Simpson.*

JUSTICE SCALIA delivered the opinion of the Court.

This case presents the question whether, in an action for money damages, a United States District Court has the power to issue a preliminary injunction preventing the defendant from transferring assets in which no lien or equitable interest is claimed.

I

Petitioner Grupo Mexicano de Desarrollo, S. A. (GMD), is a Mexican holding company. In February 1994, GMD issued $250 million of 8.25% unsecured, guaranteed notes due in 2001 (Notes), which ranked pari passu in priority of payment with all of GMD's other unsecured and unsubordinated debt. Interest payments were due in February and August of every year. Four subsidiaries of GMD (which are the remaining petitioners) guaranteed the Notes. Respondents are investment funds which purchased approximately $75 million of the Notes.

Between 1990 and 1994, GMD was involved in a toll road construction program sponsored by the Government of Mexico. In order to elicit private financing, the Mexican Government granted concessions to companies that would build and operate the system of toll roads. GMD was both an investor in the concessionaries and among the construction companies hired by the concessionaries to build the toll

---

*Daniel W. Krasner filed a brief for the Dominican Republic urging reversal.

Briefs of amici curiae urging affirmance were filed for the United States by Solicitor General Waxman, Acting Assistant Attorney General Ogden, Deputy Solicitor General Kneedler, Edward C. DuMont, Michael Jay Singer, and Peter J. Smith; and for the Securities Industry Association et al. by Richard A. Rosen and Robert S. Smith.

roads. Problems in the Mexican economy resulted in severe losses for the concessionaries, who were therefore unable to pay contractors like GMD. In response to these problems, in 1997, the Mexican Government announced the Toll Road Rescue Program, under which it would issue guaranteed notes (Toll Road Notes) to the concessionaries, in exchange for their ceding to the Government ownership of the toll roads. The Toll Road Notes were to be used to pay the bank debt of the concessionaries, and also to pay outstanding receivables held by GMD and other contractors for services rendered to the concessionaries (Toll Road Receivables). In the fall of 1997, GMD announced that it expected to receive approximately $309 million of Toll Road Notes under the program.

Because of the downturn in the Mexican economy and the related difficulties in the toll road program, by mid-1997 GMD was in serious financial trouble. In addition to the Notes, GMD owed other debts of about $450 million. GMD's 1997 Form 20–F, which was filed with the Securities and Exchange Commission on June 30, 1997, stated that GMD's current liabilities exceeded its current assets and that there was "substantial doubt" whether it could continue as a going concern. As a result of these financial problems, neither GMD nor its subsidiaries (who had guaranteed payment) made the August 1997 interest payment on the Notes.

Between August and December 1997, GMD attempted to negotiate a restructuring of its debt with its creditors. On August 26, Reuters reported that GMD was negotiating with the Mexican banks to reduce its $256 million bank debt, and that it planned to deal with this liability before negotiating with the investors owning the Notes. On October 28, GMD publicly announced that it would place in trust its right to receive $17 million of Toll Road Notes, to cover employee compensation payments, and that it had transferred its right to receive $100 million of Toll Road Notes to the Mexican

Government (apparently to pay back taxes). GMD also negotiated with the holders of the Notes (including respondents) to restructure that debt, but by December these negotiations had failed.

On December 11, respondents accelerated the principal amount of their Notes, and, on December 12, filed suit for the amount due in the United States District Court for the Southern District of New York (petitioners had consented to personal jurisdiction in that forum). The complaint alleged that "GMD is at risk of insolvency, if not insolvent already"; that GMD was dissipating its most significant asset, the Toll Road Notes, and was preferring its Mexican creditors by its planned allocation of Toll Road Notes to the payment of their claims, and by its transfer to them of Toll Road Receivables; and that these actions would "frustrate any judgment" respondents could obtain. App. 29–30. Respondents sought breach-of-contract damages of $80.9 million, and requested a preliminary injunction restraining petitioners from transferring the Toll Road Notes or Receivables. On that same day, the District Court entered a temporary restraining order preventing petitioners from transferring their right to receive the Toll Road Notes.

On December 23, the District Court entered an order in which it found that "GMD is at risk of insolvency if not already insolvent"; that the Toll Road Notes were GMD's "only substantial asset"; that GMD planned to use the Toll Road Notes "to satisfy its Mexican creditors to the exclusion of [respondents] and other holders of the Notes"; that "[i]n light of [petitioners'] financial condition and dissipation of assets, any judgment [respondents] obtain in this action will be frustrated"; that respondents had demonstrated irreparable injury; and that it was "almost certain" that respondents would succeed on the merits of their claim. App. to Pet. for Cert. 25a–26a. It preliminarily enjoined petitioners "from dissipating, disbursing, transferring, conveying, encumbering

or otherwise distributing or affecting any [petitioner's] right to, interest in, title to or right to receive or retain, any of the [Toll Road Notes]." *Id.*, at 26a. The court ordered respondents to post a $50,000 bond.

The Second Circuit affirmed. 143 F. 3d 688 (1998). We granted certiorari, 525 U. S. 1015 (1998).

## II

Respondents contend that events subsequent to petitioners' appeal of the preliminary injunction render this case moot. While that appeal was pending in the Second Circuit, the case proceeded in the District Court. Petitioners filed an answer and asserted various counterclaims. On April 17, 1998, the District Court granted summary judgment to respondents on their contract claim and dismissed petitioners' counterclaims. The court ordered petitioners to pay respondents $82,444,259 by assignment or transfer of Toll Road Receivables or Toll Road Notes; the court also converted the preliminary injunction into a permanent injunction pending such assignment or transfer. Although petitioners initially appealed both portions of this order to the Second Circuit, they later abandoned their appeal from the permanent injunction. The appeal from the payment order is still pending in the Second Circuit. The same date the District Court entered judgment, respondents moved to dismiss petitioners' first appeal—the one now before us—arguing that the final judgment rendered the appeal moot. On May 4, the Second Circuit denied the motion to dismiss and two days later affirmed, as mentioned above, the District Court's grant of the preliminary injunction.

Respondents argue that the issue of the propriety of the preliminary injunction is moot because that injunction is now merged into the permanent injunction. Petitioners contend that the case is not moot because, if we hold that the District Court was without power to issue the preliminary injunction,

then under Federal Rules of Civil Procedure 65(c) and 65.1[1] they will have a claim against the injunction bond. They assert that the injunction "interfered with GMD's efforts to restructure its debt and substantially impaired GMD's ability to continue its operations in the ordinary course of business." Brief for Petitioners 7. Respondents concede that a party who has been wrongfully enjoined has a claim on the bond, but they argue that although such a claim might mean that the *case* is not moot, it does not prevent this *interlocutory appeal* from becoming moot. In any event, say respondents, because a claim for wrongful injunction requires that the enjoined party win on the ultimate merits, petitioners have forfeited any claim by failing to appeal the portion of the District Court's judgment converting the preliminary injunction into a permanent injunction.

Generally, an appeal from the grant of a preliminary injunction becomes moot when the trial court enters a permanent injunction, because the former merges into the latter. We have dismissed appeals in such circumstances. See, *e. g.*, *Smith* v. *Illinois Bell Telephone Co.*, 270 U. S. 587, 588–589 (1926). We agree with petitioners, however, that their potential cause of action against the injunction bond preserves our jurisdiction over this appeal. Cf. *Liner* v. *Jafco, Inc.*, 375 U. S. 301, 305–306 (1964).

In the case of the usual preliminary injunction, the plaintiff seeks to enjoin, pending the outcome of the litigation, action that he claims is unlawful. If his lawsuit turns out to be meritorious—if he is found to be entitled to the permanent injunction that he seeks—even if the preliminary injunction was wrongly issued (because at that stage of the

---

[1] Rule 65(c) provides that an applicant for a preliminary injunction must obtain security "for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained." Rule 65.1 states in part that "[t]he surety's liability may be enforced on motion without the necessity of an independent action."

litigation the plaintiff's prospects of winning were not sufficiently clear, or the plaintiff was not suffering irreparable injury) its issuance would in any event be harmless error. The final injunction establishes that the defendant *should not have been engaging in the conduct that was enjoined.* Hence, it is reasonable to regard the preliminary injunction as merging into the final one: If the latter is valid, the former is, if not procedurally correct, at least harmless. A quite different situation obtains in the present case, where (according to petitioners' claim) the substantive validity of the final injunction does *not* establish the substantive validity of the preliminary one. For the latter was issued not to enjoin *unlawful* conduct, but rather to *render* unlawful conduct that would otherwise be permissible, in order to protect the anticipated judgment of the court; and it is the essence of petitioners' claim that such an injunction can be issued only after the judgment is rendered. If petitioners are correct, they *have* been harmed by issuance of the unauthorized preliminary injunction—and hence *should* be able to recover on the bond—*even if* the final injunction is proper. It would make no sense, when this is the claim, to say that the preliminary injunction merges into the final one.[2]

---

[2] We recognize that respondents alleged in their complaint that the assignments of the rights to receive Toll Road Notes violated the negative pledge clause of the note instrument and the provision that the Notes ranked *pari passu* with other debt, and therefore that petitioners were not entitled to engage in the restrained conduct. We do not, however, understand the District Court to have made a finding—either in the preliminary injunction order or in the final order—that petitioners' enjoined conduct was unlawful. The mootness of petitioners' claim at the present stage of the proceedings must be assessed on the basis of what that claim *is.* As shown by the question on which we granted certiorari, it is that the District Court wrongfully entered an order to protect its judgment before the judgment was rendered. If, in fact, petitioners had no right under the note instrument to take the actions that were enjoined, that would presumably be a defense to the action on the injunction bond. See, e. g., *Blumenthal* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 910 F. 2d 1049, 1054 (CA2 1990); Note, Recovery for Wrongful Interlocutory Injunc-

We reject respondents' argument that the controversy over the bond saves the "case" from mootness, but does not save the "issue" of the validity of the preliminary injunction from mootness. *University of Texas* v. *Camenisch*, 451 U. S. 390 (1981), upon which respondents principally rely, is inapposite. In that case a deaf graduate student sued the University of Texas to obtain an injunction requiring the school to pay for a sign-language interpreter for his school work. The District Court granted a preliminary injunction and required the student to post an injunction bond. Pending appeal of that injunction, the university paid for the interpreter, but the student graduated before the Court of Appeals issued its decision. Nevertheless, the Court of Appeals held that the appeal of the preliminary injunction was not moot because the issue of who had to pay for the interpreter remained. We reversed:

> "The Court of Appeals correctly held that the case as a whole is not moot, since, as that court noted, it remains to be decided who should ultimately bear the cost of the interpreter. However, the issue before the Court of Appeals was not who should pay for the interpreter, but rather whether the District Court had abused its discretion in issuing a preliminary injunction requiring the University to pay for him. The two issues are significantly different, since whether the preliminary injunction should have issued depended on the balance of factors listed in [Fifth Circuit precedent], while whether the University should ultimately bear the cost of the interpreter depends on a final resolution of the merits of Camenisch's case.

---

tions Under Rule 65(c), 99 Harv. L. Rev. 828, 836 (1986). But it does not bear upon the mootness of petitioners' present claim.

"This, then, is simply another instance in which one issue in a case has become moot, but the case as a whole remains alive because other issues have not become moot. . . . Because the only issue presently before us—the correctness of the decision to grant a preliminary injunction—is moot, the judgment of the Court of Appeals must be vacated and the case must be remanded to the District Court for trial on the merits." *Id.*, at 393–394 (citations omitted).

*Camenisch* is simply an application of the same principle which underlies the rule that a preliminary injunction ordinarily merges into the final injunction. Since the preliminary injunction no longer had any effect (the student had graduated), and since the substantive issue governing the propriety of what had been paid under the preliminary injunction (as opposed to the procedural issue of whether the injunction should have issued when it did) was the same issue underlying the merits claim, there was no sense in trying the preliminary injunction question separately. In the present case, however, petitioners' basis for arguing that the preliminary injunction was wrongfully issued—which is that the District Court lacked the power to restrain their use of assets pending a money judgment—is independent of respondents' claim on the merits—which is that petitioners breached the note instrument by failing to make the August 1997 interest payment. The resolution of the merits is immaterial to the validity of petitioners' potential claim on the bond. Cf. *American Can Co.* v. *Mansukhani*, 742 F. 2d 314, 320–321 (CA7 1984); *Stacey G.* v. *Pasadena Independent Sch. Dist.*, 695 F. 2d 949, 955 (CA5 1983).

For the same reason, petitioners' failure to appeal the permanent injunction does not forfeit their claim that the preliminary injunction was wrongful. Petitioners do not contest the District Court's power to issue a permanent injunction after rendering a money judgment against them,

but they do contest its power to issue a *preliminary* injunction, and they do so on a ground that has nothing to do with the validity of the permanent injunction. And again for the same reason, we reject respondents' argument that petitioners have no wrongful injunction claim because they lost the case on the merits.

## III

We turn, then, to the merits question whether the District Court had authority to issue the preliminary injunction in this case pursuant to Federal Rule of Civil Procedure 65.[3] The Judiciary Act of 1789 conferred on the federal courts jurisdiction over "all suits . . . in equity." § 11, 1 Stat. 78. We have long held that "[t]he 'jurisdiction' thus conferred . . . is an authority to administer in equity suits the principles of the system of judicial remedies which had been devised and was being administered by the English Court of Chancery at the time of the separation of the two countries." *Atlas Life Ins. Co.* v. *W. I. Southern, Inc.,* 306 U. S. 563, 568 (1939). See also, *e. g., Stainback* v. *Mo Hock Ke Lok Po,* 336 U. S. 368, 382, n. 26 (1949); *Guaranty Trust Co.* v. *York,* 326 U. S. 99, 105 (1945); *Gordon* v. *Washington,* 295 U. S. 30, 36 (1935). "Substantially, then, the equity jurisdiction of the federal courts is the jurisdiction in equity exercised by the High Court of Chancery in England at the time of the adoption of the Constitution and the enactment of the original Judiciary Act, 1789 (1 Stat. 73)." A. Dobie, Handbook of Federal Jurisdiction and Procedure 660 (1928). "[T]he substantive prerequisites for obtaining an equitable remedy as

---

[3] Although this is a diversity case, respondents' complaint sought the injunction pursuant to Rule 65, and the Second Circuit's decision was based on that rule and on federal equity principles. Petitioners argue for the first time before this Court that under *Erie R. Co.* v. *Tompkins,* 304 U. S. 64 (1938), the availability of this injunction under Rule 65 should be determined by the law of the forum State (in this case New York). Because this argument was neither raised nor considered below, we decline to consider it.

well as the general availability of injunctive relief are not altered by [Rule 65] and depend on traditional principles of equity jurisdiction." 11A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2941, p. 31 (2d ed. 1995). We must ask, therefore, whether the relief respondents requested here was traditionally accorded by courts of equity.

## A

Respondents do not even argue this point. The United States as *amicus curiae,* however, contends that the preliminary injunction issued in this case is analogous to the relief obtained in the equitable action known as a "creditor's bill." This remedy was used (among other purposes) to permit a judgment creditor to discover the debtor's assets, to reach equitable interests not subject to execution at law, and to set aside fraudulent conveyances. See 1 D. Dobbs, Law of Remedies § 2.8(1), pp. 191–192 (2d ed. 1993); 4 S. Symons, Pomeroy's Equity Jurisprudence § 1415, pp. 1065–1066 (5th ed. 1941); 1 G. Glenn, Fraudulent Conveyances and Preferences § 26, p. 51 (rev. ed. 1940). It was well established, however, that, as a general rule, a creditor's bill could be brought only by a creditor who had already obtained a judgment establishing the debt. See, *e. g., Pusey & Jones Co.* v. *Hanssen,* 261 U. S. 491, 497 (1923); *Hollins* v. *Brierfield Coal & Iron Co.,* 150 U. S. 371, 378–379 (1893); *Cates* v. *Allen,* 149 U. S. 451, 457 (1893); *National Tube Works Co.* v. *Ballou,* 146 U. S. 517, 523–524 (1892); *Scott* v. *Neely,* 140 U. S. 106, 113 (1891); *Smith* v. *Railroad Co.,* 99 U. S. 398, 401 (1879); *Adler* v. *Fenton,* 24 How. 407, 411–413 (1861); see also 4 Symons, *supra,* at 1067; 1 Glenn, *supra,* § 9, at 11; F. Wait, Fraudulent Conveyances and Creditors' Bills § 73, pp. 110–111 (1884). The rule requiring a judgment was a product, not just of the procedural requirement that remedies at law had to be exhausted before equitable remedies could be pursued, but also of the substantive rule that a general creditor (one without a judgment) had no cognizable interest, either

at law or in equity, in the property of his debtor, and therefore could not interfere with the debtor's use of that property. As stated by Chancellor Kent: "The reason of the rule seems to be, that until the creditor has established his title, he has no right to interfere, and it would lead to an unnecessary, and, perhaps, a fruitless and oppressive interruption of the exercise of the debtor's rights." *Wiggins* v. *Armstrong*, 2 Johns. Ch. 144, 145–146 (N. Y. 1816). See also, *e. g., Guaranty Trust Co., supra*, at 106–107, n. 3; *Pusey & Jones Co., supra*, at 497; *Cates, supra*, at 457; *Adler, supra*, at 411–413; *Shufeldt* v. *Boehm*, 96 Ill. 560, 564 (1880); 1 Glenn, *supra*, § 9, at 11; Wait, *supra*, § 52, at 81, § 73, at 113.

The United States asserts that there were exceptions to the general rule requiring a judgment. The existence and scope of these exceptions is by no means clear.[4] Cf. G. Glenn, The Rights and Remedies of Creditors Respecting Their Debtor's Property §§ 21–24, pp. 18–21 (1915). Although the United States says that some of them "might have been relevant in a case like this one," Brief for United States as *Amicus Curiae* 11, it chooses not to resolve (or argue definitively) whether any particular one would have been, *id.*, at 12.[5] For their part, as noted above, respondents

---

[4] For example, some courts said that insolvency was an exception, but others disagreed. See, *e. g.*, Annot., Of the Demands Which Will Support a Creditor's Bill, 66 American State Reports 271, 285 (1899) (cases are "in almost hopeless conflict"). This Court has concluded that that particular exception does not exist. See, *e. g., Pusey & Jones Co.* v. *Hanssen*, 261 U. S. 491, 495–497 (1923); *Hollins* v. *Brierfield Coal & Iron Co.*, 150 U. S. 371, 385–386 (1893); *Smith* v. *Railroad Co.*, 99 U. S. 398, 400–401 (1879).

[5] Some cases suggested that there was an exception where the debt was admitted or confessed, at least if the creditor possessed an interest in the debtor's property. See, *e. g., Scott* v. *Neely*, 140 U. S. 106, 113 (1891); *D. A. Tompkins Co.* v. *Catawba Mills*, 82 F. 780, 783 (CCSC 1897). Even if the latter condition is overlooked, it is by no means clear that the action here would qualify. Petitioners' answer (filed after the preliminary injunction had issued) denied knowledge or information sufficient to form a belief (which is the equivalent of a denial, see Federal Rule of Civil Procedure 8(b)) as to respondents' allegations that petitioners were currently in-

do not discuss creditor's bills at all. Particularly in the absence of any discussion of this point by the lower courts, we are not inclined to speculate upon the existence or applicability to this case of any exceptions, and follow the well-established general rule that a judgment establishing the debt was necessary before a court of equity would interfere with the debtor's use of his property.

JUSTICE GINSBURG concedes that federal equity courts have traditionally rejected the type of provisional relief granted in this case. See *post*, at 338 (opinion concurring in part and dissenting in part). She invokes, however, "the grand aims of equity," and asserts a general power to grant relief whenever legal remedies are not "practical and efficient," unless there is a statute to the contrary. *Post*, at 342 (internal quotation marks omitted). This expansive view of equity must be rejected. Joseph Story's famous treatise reflects what we consider the proper rule, both with regard to the general role of equity in our "government of laws, not of men," and with regard to its application in the very case before us:

> "Mr. Justice Blackstone has taken considerable pains to refute this doctrine. 'It is said,' he remarks, 'that it is the business of a Court of Equity, in England, to abate the rigor of the common law. But no such power is contended for. Hard was the case of bond creditors, whose debtor devised away his real estate . . . . But a Court of Equity can give no relief . . . .' And illustrations of the same character may be found in every state of the Union. . . . In many [States], if not in all, a debtor may prefer one creditor to another, in discharging his debts, whose assets are wholly insufficient to pay all the

---

debted to respondents in the amount of $80.9 million, and that petitioners breached their agreements under the Notes and the related guarantee; and denied respondents' allegations that all conditions precedent to suit had occurred, been waived, or otherwise been satisfied, and that respondents had suffered damages of $80.9 million.

debts." 1 Commentaries on Equity Jurisprudence § 12, pp. 14–15 (1836).

See also *infra*, at 332–333. We do not question the proposition that equity is flexible; but in the federal system, at least, that flexibility is confined within the broad boundaries of traditional equitable relief. To accord a type of relief that has never been available before—and especially (as here) a type of relief that has been specifically disclaimed by longstanding judicial precedent—is to invoke a "default rule," *post*, at 342, not of flexibility but of omnipotence. When there are indeed new conditions that might call for a wrenching departure from past practice, Congress is in a much better position than we both to perceive them and to design the appropriate remedy. Despite JUSTICE GINSBURG's allusion to the "increasing complexities of modern business relations," *post*, at 337 (internal quotation marks omitted), and to the bygone "age of slow-moving capital and comparatively immobile wealth," *post*, at 338, we suspect there is absolutely nothing new about debtors' trying to avoid paying their debts, or seeking to favor some creditors over others—or even about their seeking to achieve these ends through "sophisticated . . . strategies," *ibid.* The law of fraudulent conveyances and bankruptcy was developed to prevent such conduct; an equitable power to restrict a debtor's use of his unencumbered property before judgment was not.

Respondents argue (supported by the United States) that the merger of law and equity changed the rule that a general creditor could not interfere with the debtor's use of his property. But the merger did not alter substantive rights. "Notwithstanding the fusion of law and equity by the Rules of Civil Procedure, the substantive principles of Courts of Chancery remain unaffected." *Stainback*, 336 U. S., at 382, n. 26. Even in the absence of historical support, we would not be inclined to believe that it is merely a question of procedure whether a person's unencumbered assets can be

frozen by general-creditor claimants before their claims have been vindicated by judgment. It seems to us that question goes to the substantive rights of all property owners. In any event it appears, as we have observed, that the rule requiring a judgment was historically regarded as serving, not merely the procedural end of assuring exhaustion of legal remedies (which the merger of law and equity could render irrelevant), but also the substantive end of giving the creditor an interest in the property which equity could then act upon. See *supra*, at 319–320.[6]

We note that none of the parties or *amici* specifically raised the applicability to this case of Federal Rule of Civil Procedure 18(b), which states:

"Whenever a claim is one heretofore cognizable only after another claim has been prosecuted to a conclusion, the two claims may be joined in a single action; but the court shall grant relief in that action only in accordance with the relative substantive rights of the parties. In particular, a plaintiff may state a claim for money and a claim to have set aside a conveyance fraudulent as to that plaintiff, without first having obtained a judgment establishing the claim for money."

---

[6] As we stated in *Adler* v. *Fenton*, 24 How. 407, 411–412 (1861): "'Our laws determine with accuracy the time and manner in which the property of a debtor ceases to be subject to his disposition, and becomes subject to the rights of his creditor. A creditor acquires a lien upon the lands of his debtor by a judgment; and upon the personal goods of the debtor, by the delivery of an execution to the sheriff. It is only by these liens that a creditor has any vested or specific right in the property of his debtor. Before these liens are acquired, the debtor has full dominion over his property; he may convert one species of property into another, and he may alienate to a purchaser. The rights of the debtor, and those of a creditor, are thus defined by positive rules; and the points at which the power of the debtor ceases, and the right of the creditor commences, are clearly established. These regulations cannot be contravened or varied by any interposition of equity'" (quoting *Moran* v. *Dawes*, 1 Hopk. Ch. 365, 367 (N. Y. 1825)).

Because the Rule was neither mentioned by the lower courts nor briefed by the parties, we decline to consider its application to the present case. We note, however, that it says nothing about preliminary relief, and specifically reserves substantive rights (as did the Rules Enabling Act, see 28 U. S. C. § 2072(b)).[7]

B

Respondents contend that two of our postmerger cases support the District Court's order "in principle." Brief for Respondents 22. We find both of these cases entirely consistent with the view that the preliminary injunction in this case was beyond the equitable authority of the District Court.

In *Deckert* v. *Independence Shares Corp.*, 311 U. S. 282 (1940), purchasers of certificates that entitled the holders to invest in a trust of common stocks sued the company that sold the certificates and the company administering the trust, and related officers and affiliates, under the Securities Act of 1933, alleging that the sale was fraudulent. They further alleged that the company that sold the certificates was insolvent, that it was likely to make preferential payments to certain creditors, and that its assets were in danger of dissipation. They sought the appointment of a receiver and an injunction restraining the company administering the trust from transferring any assets of the corporations or of the trust. The District Court preliminarily enjoined the company from transferring a fixed sum. *Id.*, at 285–286.

---

[7] Several States have adopted the Uniform Fraudulent Conveyance Act (or its successor the Uniform Fraudulent Transfers Act), which has been interpreted as conferring on a nonjudgment creditor the right to bring a fraudulent conveyance claim. See generally P. Alces, Law of Fraudulent Transactions ¶ 5.04[3], p. 5–116 (1989). Insofar as Rule 18(b) applies to such an action, the state statute eliminating the need for a judgment may have altered the common-law rule that a general contract creditor has no interest in his debtor's property. Because this case does not involve a claim of fraudulent conveyance, we express no opinion on the point.

After deciding that the Securities Act permitted equitable relief, we concluded that the bill stated a cause of action for the equitable remedies of rescission of the contracts and restitution of the consideration paid, *id.*, at 287–288, and that the preliminary injunction "was a reasonable measure to preserve the status quo pending final determination of the questions raised by the bill," *id.*, at 290. *Deckert* is not on point here because, as the Court took pains to explain, "the bill state[d] a cause [of action] for equitable relief." *Id.*, at 288.

> "The principal objects of the suit are rescission of the Savings Plan contracts and restitution of the consideration paid .... That a suit to rescind a contract induced by fraud and to recover the consideration paid may be maintained in equity, at least where there are circumstances making the legal remedy inadequate, is well established." *Id.*, at 289.

The preliminary relief available in a suit seeking equitable relief has nothing to do with the preliminary relief available in a creditor's bill seeking equitable assistance in the collection of a legal debt.

In the second case relied on by respondents, *United States v. First Nat. City Bank,* 379 U. S. 378 (1965), the United States, in its suit to enforce a tax assessment and tax lien, requested a preliminary injunction preventing a third-party bank from transferring any of the taxpayer's assets which were held in a foreign branch office of the bank. *Id.*, at 379–380. Relying on a statute giving district courts the power to grant injunctions "'necessary or appropriate for the enforcement of the internal revenue laws,'" *id.*, at 380 (quoting former 26 U. S. C. § 7402(a) (1964 ed.)), we concluded that the temporary injunction was "appropriate to prevent further dissipation of assets," 379 U. S., at 385. We stated that if a district court could not issue such an injunction, foreign taxpayers could avoid their tax obligations.

*First National* is distinguishable from the present case on a number of grounds. First, of course, it involved not the Court's general equitable powers under the Judiciary Act of 1789, but its powers under the statute authorizing issuance of tax injunctions.[8] Second, *First National* relied in part on the doctrine that courts of equity will " 'go much farther both to give and withhold relief in furtherance of the public interest than they are accustomed to go when only private interests are involved,' " *id.*, at 383 (quoting *Virginian R. Co.* v. *Railway Employees*, 300 U. S. 515, 552 (1937)). And finally, although the Court did not rely on this fact, the creditor (the Government) asserted an equitable lien on the property, see 379 U. S., at 379–380, which presents a different case from that of the unsecured general creditor.

That *Deckert* and *First National* should not be read as establishing the principle relied on by respondents is strongly suggested by *De Beers Consol. Mines, Ltd.* v. *United States*, 325 U. S. 212 (1945). In that case the United States brought suit against several corporations seeking equitable relief against alleged antitrust violations. The United States also sought a preliminary injunction restraining the defendants from removing their assets from this country pending adjudication of the merits. We concluded that the injunction was beyond the power of the District Court. We stated that "[a] preliminary injunction is always appropriate to grant intermediate relief of the same character as that which may be granted finally," but that the injunction in that case dealt "with a matter lying wholly out-

---

[8] Although the United States suggests that there is statutory support for the present injunction in the All Writs Act, 28 U. S. C. § 1651, Brief for United States as *Amicus Curiae* 18, we have said that the power conferred by the predecessor of that provision is defined by "what is the usage, and what are the principles of equity applicable in such a case." *De Beers Consol. Mines, Ltd.* v. *United States*, 325 U. S. 212, 219 (1945). That is the very inquiry in which we have engaged.

side the issues in the suit." *Id.,* at 220. We pointed out that "Federal and State courts appear consistently to have refused relief of the nature here sought," *id.,* at 221, and we concluded:

> "To sustain the challenged order would create a precedent of sweeping effect. This suit, as we have said, is not to be distinguished from any other suit in equity. What applies to it applies to all such. Every suitor who resorts to chancery for any sort of relief by injunction may, on a mere statement of belief that the defendant can easily make away with or transport his money or goods, impose an injunction on him, indefinite in duration, disabling him to use so much of his funds or property as the court deems necessary for security or compliance with its possible decree. And, if so, it is difficult to see why a plaintiff in any action for a personal judgment in tort or contract may not, also, apply to the chancellor for a so-called injunction sequestrating his opponent's assets pending recovery and satisfaction of a judgment in such a law action. No relief of this character has been thought justified in the long history of equity jurisprudence." *Id.,* at 222–223.

The statements in the last two sentences, though dictum, confirms that the relief sought by respondents does not have a basis in the traditional powers of equity courts.

### C

As further support for the proposition that the relief accorded here was unknown to traditional equity practice, it is instructive that the English Court of Chancery, from which the First Congress borrowed in conferring equitable powers on the federal courts, did not provide an injunctive remedy such as this until 1975. In that year, the Court of Appeal decided *Mareva Compania Naviera S. A.* v. *International*

*Bulkcarriers S. A.,* 2 Lloyd's Rep. 509.[9]  *Mareva,* although acknowledging that the prior case of *Lister & Co.* v. *Stubbs,* [1890] 45 Ch. D. 1 (C. A.), said that a court has no power to protect a creditor before he gets judgment,[10] relied on a statute giving courts the authority to grant an interlocutory injunction " 'in all cases in which it shall appear to the court to be just or convenient,' " 2 Lloyd's Rep., at 510 (quoting Judicature Act of 1925, Law Reports 1925 (2), 15 & 16 Geo. V, ch. 49, §45).   It held (in the words of Lord Denning) that "[i]f it appears that the debt is due and owing—and there is a danger that the debtor may dispose of his assets so as to defeat it before judgment—the Court has jurisdiction in a proper case to grant an interlocutory judgment so as to prevent him *[sic]* disposing of those assets." 2 Lloyd's Rep., at 510.   The *Mareva* injunction has now been confirmed by statute.   See Supreme Court Act of 1981, §37, 11 Halsbury's Statutes 966, 1001 (1991 reissue).

Commentators have emphasized that the adoption of *Mareva* injunctions was a dramatic departure from prior practice.

> "Before 1975 the courts would not grant an injunction to restrain a defendant from disposing of his assets pen-

---

[9] Apparently the first *"Mareva"* injunction was actually issued in *Nippon Yusen Kaisha* v. *Karageorgis,* [1975] 2 Lloyd's Rep. 137 (C. A.), in which Lord Denning recognized the prior practice of not granting such injunctions, but stated that "the time has come when we should revise our practice."   *Id.,* at 138; see also Hetherington, Introduction to the Mareva Injunction, in Mareva Injunctions 1, n. 1 (M. Hetherington ed. 1983).   For whatever reason, *Mareva* has gotten the credit (or blame), and we follow the tradition of leaving *Nippon Yusen* in the shadows.

[10] In *Lister & Co.* v. *Stubbs,* 45 Ch. D., at 1, 13, the Court of Appeal held that an injunction restraining the defendant's use of assets could not be issued.   Lord Justice Cotton stated: "I know of no case where, because it was highly probable that if the action were brought to a hearing the plaintiff could establish that a debt was due to him from the defendant, the defendant has been ordered to give security until that has been established by the judgment or decree."

dente lite merely because the plaintiff feared that by the time he obtained judgment the defendant would have no assets against which execution could be levied. Applications for such injunctions were consistently refused in the English Commercial Court as elsewhere. They were thought to be so clearly beyond the powers of the court as to be 'wholly unarguable.'" Hetherington, *supra* n. 9, at 3.

See also Wasserman, Equity Renewed: Preliminary Injunctions to Secure Potential Money Judgments, 67 Wash. L. Rev. 257, 337 (1992) (stating that *Mareva* "revolutionized English practice"). The *Mareva* injunction has been recognized as a powerful tool for general creditors; indeed, it has been called the "nuclear weapo[n] of the law." R. Ough & W. Flenley, The Mareva Injunction and Anton Piller Order: Practice and Precedents xi (2d ed. 1993).

The parties debate whether *Mareva* was based on statutory authority or on inherent equitable power. See Brief for Petitioners 17, n. 8; Brief for Respondents 35–36. Regardless of the answer to this question, it is indisputable that the English courts of equity did not actually *exercise* this power until 1975, and that federal courts in this country have traditionally applied the principle that courts of equity will not, as a general matter, interfere with the debtor's disposition of his property at the instance of a nonjudgment creditor. We think it incompatible with our traditionally cautious approach to equitable powers, which leaves any substantial expansion of past practice to Congress, to decree the elimination of this significant protection for debtors.

## IV

The parties and *amici* discuss various arguments for and against creating the preliminary injunctive remedy at issue in this case. The United States suggests that the factors supporting such a remedy include

> "simplicity and uniformity of procedure; preservation of the court's ability to render a judgment that will prove enforceable; prevention of inequitable conduct on the part of defendants; avoiding disparities between defendants that have assets within the jurisdiction (which would be subject to pre-judgment attachment 'at law') and those that do not; avoiding the necessity for plaintiffs to locate a forum in which the defendant has substantial assets; and, in an age of easy global mobility of capital, preserving the attractiveness of the United States as a center for financial transactions." Brief for United States as *Amicus Curiae* 16.

But there are weighty considerations on the other side as well, the most significant of which is the historical principle that before judgment (or its equivalent) an unsecured creditor has no rights at law or in equity in the property of his debtor. As one treatise writer explained:

> "A rule of procedure which allowed any prowling creditor, before his claim was definitely established by judgment, and without reference to the character of his demand, to file a bill to discover assets, or to impeach transfers, or interfere with the business affairs of the alleged debtor, would manifestly be susceptible of the grossest abuse. A more powerful weapon of oppression could not be placed at the disposal of unscrupulous litigants." Wait, Fraudulent Conveyances § 73, at 110–111.

The requirement that the creditor obtain a prior judgment is a fundamental protection in debtor-creditor law—rendered all the more important in our federal system by the debtor's right to a jury trial on the legal claim. There are other factors which likewise give us pause: The remedy sought here could render Federal Rule of Civil Procedure 64, which authorizes use of state prejudgment remedies, a virtual irrelevance. Why go through the trouble of complying with local

attachment and garnishment statutes when this all-purpose prejudgment injunction is available? More importantly, by adding, through judicial fiat, a new and powerful weapon to the creditor's arsenal, the new rule could radically alter the balance between debtor's and creditor's rights which has been developed over centuries through many laws—including those relating to bankruptcy, fraudulent conveyances, and preferences. Because any rational creditor would want to protect his investment, such a remedy might induce creditors to engage in a "race to the courthouse" in cases involving insolvent or near-insolvent debtors, which might prove financially fatal to the struggling debtor. (In this case, we might observe, the respondents did not represent all of the holders of the Notes; they were an active few who sought to benefit at the expense of the other noteholders as well as GMD's other creditors.[11]) It is significant that, in England, use of the *Mareva* injunction has expanded rapidly. "Since 1975, the English courts have awarded *Mareva* injunctions to freeze assets in an ever-increasing set of circumstances both within and beyond the commercial setting to an ever-expanding number of plaintiffs." Wasserman, *supra*, at 339. As early as 1984, one observer stated that "[t]here are now a steady flow of such applications to our Courts which have been estimated to exceed one thou-

---

[11] JUSTICE GINSBURG suggests that respondents acted to benefit all of GMD's creditors. See *post*, at 341, n. 6. But respondents' complaint sought the full amount they were allegedly owed, despite their contention that petitioners could not pay all their creditors. It is not clear that the "trust in compliance with Mexican law" that respondents proposed as a possible preliminary remedy, *ibid.*, was to be for the benefit of all creditors, rather than respondents alone—but that remedy was in any event denied, which did not deter respondents from seeking a simple freeze on assets to satisfy their anticipated judgment. There is nothing whatever wrong with respondents' pursuing their own interests. Indeed, the fact that it is entirely proper and entirely predictable is the very premise of the point we are making: that this new remedy will promote unregulated competition among the creditors of a struggling debtor.

sand per month." Shenton, Attachments and Other Interim Court Remedies in Support of Arbitration, 1984 Int'l Bus. Law. 101, 104.

We do not decide which side has the better of these arguments. We set them forth only to demonstrate that resolving them in this forum is incompatible with the democratic and self-deprecating judgment we have long since made: that the equitable powers conferred by the Judiciary Act of 1789 did not include the power to create remedies previously unknown to equity jurisprudence. Even when sitting as a court in equity, we have no authority to craft a "nuclear weapon" of the law like the one advocated here. Joseph Story made the point many years ago:

> "If, indeed, a Court of Equity in England did possess the unbounded jurisdiction, which has been thus generally ascribed to it, of correcting, controlling, moderating, and even superceding the law, and of enforcing all the rights, as well as charities, arising from natural law and justice, and of freeing itself from all regard to former rules and precedents, it would be the most gigantic in its sway, and the most formidable instrument of arbitrary power, that could well be devised. It would literally place the whole rights and property of the community under the arbitrary will of the Judge, acting, if you please, *arbitrio boni judicis,* and it may be, *ex aequo et bono,* according to his own notions and conscience; but still acting with a despotic and sovereign authority. A Court of Chancery might then well deserve the spirited rebuke of Seldon; 'For law we have a measure, and know what to trust to—Equity is according to the conscience of him, that is Chancellor; and as that is larger, or narrower, so is Equity. 'T is all one, as if they should make the standard for the measure the Chancellor's foot. What an uncertain measure would this be? One Chancellor has a long foot; another a short foot; a third an indifferent foot. It

is the same thing with the Chancellor's conscience.'" 1 Commentaries on Equity Jurisprudence § 19, at 21.

The debate concerning this formidable power over debtors should be conducted and resolved where such issues belong in our democracy: in the Congress.

* * *

Because such a remedy was historically unavailable from a court of equity, we hold that the District Court had no authority to issue a preliminary injunction preventing petitioners from disposing of their assets pending adjudication of respondents' contract claim for money damages. We reverse the judgment of the Second Circuit and remand the case for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE GINSBURG, with whom JUSTICE STEVENS, JUSTICE SOUTER, and JUSTICE BREYER join, concurring in part and dissenting in part.

I

Uncontested evidence presented to the District Court at the preliminary injunction hearing showed that petitioner Grupo Mexicano de Desarrollo, S. A. (GMD), had defaulted on its contractual obligations to respondents, a group of GMD noteholders (Alliance), see App. to Pet. for Cert. 24a, 31a, that Alliance had satisfied all conditions precedent to its breach of contract claim, see *id.,* at 25a, and that GMD had no plausible defense on the merits, see *id.,* at 25a, 36a. Alliance also demonstrated that GMD had undertaken to treat Alliance's claims on the same footing as all other unsecured, unsubordinated debt, see *id.,* at 24a, but that GMD was in fact satisfying Mexican creditors to the exclusion of Alliance, *id.,* at 26a. Furthermore, unchallenged evidence indicated that GMD was so rapidly disbursing its sole remaining asset that, absent provisional action by the District Court, Alli-

ance would have been unable to collect on the money judgment for which it qualified. See *id.*, at 26a, 32a.[1]

Had it been possible for the District Judge to set up "a pie-powder court . . . on the instant and on the spot," *Parks* v. *Boston,* 32 Mass. 198, 208 (1834) (Shaw, C. J.), the judge could have moved without pause from evidence taking to entry of final judgment for Alliance, including an order prohibiting GMD from transferring assets necessary to satisfy the judgment. Lacking any such device for instant adjudication, the judge employed a preliminary injunction "to preserve the relative positions of the parties until a trial on the merits [could] be held." *University of Texas* v. *Camenisch,* 451 U. S. 390, 395 (1981). The order enjoined GMD from distributing assets likely to be necessary to satisfy the judgment in the instant case, but gave Alliance no security interest in GMD's assets, nor any preference relative to GMD's other creditors. Moreover, the injunction expressly reserved to GMD the option of commencing proceedings under the bankruptcy laws of Mexico or the United States. App. to Pet. for Cert. 27a. In addition, the District Judge recorded his readiness to modify the interim order if necessary to keep GMD in business. See *id.*, at 53a. The preliminary injunction thus constrained GMD only to the extent essential to the subsequent entry of an effective judgment.

The Court nevertheless disapproves the provisional relief ordered by the District Court, holding that a preliminary injunction freezing assets is beyond the equitable authority of the federal courts. I would not so disarm the district

---

[1] GMD did not seek Second Circuit review of the District Court's fact findings on irreparable harm or of that court's determination that Alliance almost certainly would prevail on the merits. See Brief for Petitioners 7. Nor does GMD cast any doubt on those matters here. Instead, GMD forthrightly concedes that had the District Court declined to issue the preliminary injunction, GMD would have had no assets available to satisfy the money judgment that Alliance ultimately obtained. See Tr. of Oral Arg. 8–9.

courts. As I comprehend the courts' authority, injunctions of this kind, entered in the circumstances presented here, are within federal equity jurisdiction. Satisfied that the injunction issued in this case meets the exacting standards for preliminary equitable relief, I would affirm the judgment of the Second Circuit.[2]

## II

The Judiciary Act of 1789 gave the lower federal courts jurisdiction over "all suits . . . in equity." §11, 1 Stat. 78. We have consistently interpreted this jurisdictional grant to confer on the district courts "authority to administer . . . the principles of the system of judicial remedies which had been devised and was being administered" by the English High Court of Chancery at the time of the founding. *Atlas Life Ins. Co.* v. *W. I. Southern, Inc.,* 306 U. S. 563, 568 (1939).

As I see it, the preliminary injunction ordered by the District Court was consistent with these principles. We long ago recognized that district courts properly exercise their equitable jurisdiction where "the remedy in equity could alone furnish relief, and . . . the ends of justice requir[e] the injunction to be issued." *Watson* v. *Sutherland,* 5 Wall. 74, 79 (1867). Particularly, district courts enjoy the "historic federal judicial discretion to preserve the situation [through provisional relief] pending the outcome of a case lodged in court." 11A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure §2943, p. 79 (2d ed. 1995). The District Court acted in this case in careful accord with these prescriptions, issuing the preliminary injunction only upon well-supported findings that Alliance had "[no] adequate remedy at law," would be "frustrated" in its ability to recover a judgment absent interim injunctive relief, and was

---

[2] I agree, for the reasons JUSTICE SCALIA states, see *ante,* at 313–318, that the case is not moot; accordingly, I join Part II of the Court's opinion.

"almost certain" to prevail on the merits.    App. to Pet. for Cert. 26a.[3]

The Court holds the District Court's preliminary freeze order impermissible principally because injunctions of this kind were not "traditionally accorded by courts of equity" at the time the Constitution was adopted.    *Ante,* at 319; see *ante,* at 333.    In my view, the Court relies on an unjustifiably static conception of equity jurisdiction.    From the beginning, we have defined the scope of federal equity in relation to the *principles* of equity existing at the separation of this country from England, see, *e. g., Payne* v. *Hook,* 7 Wall. 425, 430 (1869); *Gordon* v. *Washington,* 295 U. S. 30, 36 (1935); we have never limited federal equity jurisdiction to the specific practices and remedies of the pre-Revolutionary Chancellor.

Since our earliest cases, we have valued the adaptable character of federal equitable power.    See *Seymour* v. *Freer,* 8 Wall. 202, 218 (1869) ("[A] court of equity ha[s] unquestionable authority to apply its flexible and comprehensive jurisdiction in such manner as might be necessary to the right administration of justice between the parties."); *Hecht Co.* v. *Bowles,* 321 U. S. 321, 329 (1944) ("Flexibility rather than rigidity has distinguished [federal equity jurisdiction]."). We have also recognized that equity must evolve over time, "in order to meet the requirements of every case, and to satisfy the needs of a progressive social condition in which new primary rights and duties are constantly arising and new kinds of wrongs are constantly committed."    *Union Pacific R. Co.* v. *Chicago, R. I. & P. R. Co.,* 163 U. S. 564,

---

[3] We have on three occasions considered the availability of a preliminary injunction to freeze assets pending litigation, see *Deckert* v. *Independence Shares Corp.,* 311 U. S. 282 (1940); *De Beers Consol. Mines, Ltd.* v. *United States,* 325 U. S. 212 (1945); *United States* v. *First Nat. City Bank,* 379 U. S. 378 (1965).    As the Court recognizes, see *ante,* at 324–327, these cases involved factual and legal circumstances markedly different from those presented in this case and thus do not rule out or in the provisional remedy at issue here.

601 (1896) (internal quotation marks omitted); see also 1 S. Symons, Pomeroy's Equity Jurisprudence § 67, p. 89 (5th ed. 1941) (the "American system of equity is preserved and maintained . . . to render the national jurisprudence as a whole adequate to the social needs . . . . [I]t possesses an inherent capacity of expansion, so as to keep abreast of each succeeding generation and age."). A dynamic equity jurisprudence is of special importance in the commercial law context. As we observed more than a century ago: "It must not be forgotten that in the increasing complexities of modern business relations equitable remedies have necessarily and steadily been expanded, and no inflexible rule has been permitted to circumscribe them." *Union Pacific R. Co.*, 163 U. S., at 600–601. On this understanding of equity's character, we have upheld diverse injunctions that would have been beyond the contemplation of the 18th-century Chancellor.[4]

Compared to many contemporary adaptations of equitable remedies, the preliminary injunction Alliance sought in this case was a modest measure. In operation, moreover, the preliminary injunction to freeze assets *pendente lite* may be a less heavy-handed remedy than prejudgment attachment,

---

[4] In a series of cases implementing the desegregation mandate of *Brown* v. *Board of Education*, 347 U. S. 483 (1954), for example, we recognized the need for district courts to draw on their equitable jurisdiction to supervise various aspects of local school administration. See *Freeman* v. *Pitts*, 503 U. S. 467, 491–492 (1992) (describing responsibility shouldered by district courts, "in a manner consistent with the purposes and objectives of [their] equitable power," first, to structure and supervise desegregation decrees, then, as school districts achieved compliance, to relinquish control at a measured pace). Similarly, courts enforcing the antitrust laws have superintended intricate programs of corporate dissolution or divestiture. See *United States* v. *E. I. du Pont de Nemours & Co.*, 366 U. S. 316, 328–331, and nn. 9–13 (1961) (cataloging cases); cf. *United States* v. *American Tel. & Tel. Co.*, 552 F. Supp. 131 (DC 1982), aff'd *sub nom. Maryland* v. *United States*, 460 U. S. 1001 (1983) (approving consent decree that set in train lengthy judicial oversight of divestiture of telephone monopoly).

which deprives the defendant of possession and use of the seized property. See Wasserman, Equity Renewed: Preliminary Injunctions to Secure Potential Money Judgments, 67 Wash. L. Rev. 257, 281–282, 323–324 (1992). Taking account of the office of equity, the facts of this case, and the moderate, status quo preserving provisional remedy, I am persuaded that the District Court acted appropriately.[5]

I do not question that equity courts traditionally have not issued preliminary injunctions stopping a party sued for an unsecured debt from disposing of assets pending adjudication. (As the Court recognizes, however, see *ante,* at 319–321, the historical availability of prejudgment freeze injunctions in the context of creditors' bills remains cloudy.) But it is one thing to recognize that equity courts typically did not provide this relief, quite another to conclude that, therefore, the remedy was beyond equity's capacity. I would not draw such a conclusion.

Chancery may have refused to issue injunctions of this sort simply because they were not needed to secure a just result in an age of slow-moving capital and comparatively immobile wealth. By turning away cases that the law courts could deal with adequately, the Chancellor acted to reduce the tension inevitable when justice was divided between two discrete systems. See Wasserman, *supra,* at 319. But as the facts of this case so plainly show, for creditors situated as Alliance is, the remedy at law is worthless absent the provisional relief in equity's arsenal. Moreover, increasingly sophisticated foreign-haven judgment proofing strategies, coupled with technology that permits the nearly instan-

---

[5] The Court suggests that a "debtor's right to a jury trial on [a] legal claim" counsels against the exercise of equity power here. *Ante,* at 330. But the decision to award provisional relief—whether equitable or legal—*always* rests with the judge. Moreover, the merits of any legal claim will be resolved by a jury, if there is any material issue of fact for trial, and findings made at the preliminary stage do not bind the jury. See Wasserman, 67 Wash. L. Rev., at 322–323.

taneous transfer of assets abroad, suggests that defendants may succeed in avoiding meritorious claims in ways unimaginable before the merger of law and equity. See LoPucki, The Death of Liability, 106 Yale L. J. 1, 32–38 (1996). I am not ready to say a responsible Chancellor today would deny Alliance relief on the ground that prior case law is unsupportive.

The development of *Mareva* injunctions in England after 1975 supports the view of the lower courts in this case, a view to which I adhere. As the Court observes, see *ante*, at 327–329, preliminary asset-freeze injunctions have been available in English courts since the 1975 Court of Appeal decision in *Mareva Compania Naviera S. A.* v. *International Bulkcarriers S. A.*, 2 Lloyd's Rep. 509. Although the cases reveal some uncertainty regarding *Mareva*'s jurisdictional basis, the better-reasoned and more recent decisions ground *Mareva* in equity's traditional power to remedy the "abuse" of legal process by defendants and the "injustice" that would result from defendants "making themselves judgment-proof" by disposing of their assets during the pendency of litigation. *Iraqi Ministry of Defence* v. *Arcepey Shipping Co.*, 1 All E. R. 480, 484–487 (1979) (citations omitted); see Hetherington, Introduction to the Mareva Injunction, in Mareva Injunctions 1, 10–13, and n. 95, 20 (M. Hetherington ed. 1983) (explaining the doctrinal basis of this jurisdictional theory and citing cases adopting it). That grounding, in my judgment, is secure.

## III

### A

The Court worries that permitting preliminary injunctions to freeze assets would allow creditors, " 'on a mere statement of belief that the defendant can easily make away with or transport his money or goods, [to] impose an injunction on him, indefinite in duration, disabling him to use so much of his funds or property as the court deems necessary for secu-

rity or compliance with its possible decree.'" *Ante,* at 327 (quoting *De Beers Consol. Mines, Ltd.* v. *United States,* 325 U. S. 212, 222 (1945)). Given the strong showings a creditor would be required to make to gain the provisional remedy, and the safeguards on which the debtor could insist, I agree with the Second Circuit "that this 'parade of horribles' [would] not come to pass." 143 F. 3d 688, 696 (1998).

Under standards governing preliminary injunctive relief generally, a plaintiff must show a likelihood of success on the merits and irreparable injury in the absence of an injunction. See *Doran* v. *Salem Inn, Inc.,* 422 U. S. 922, 931 (1975). Plaintiffs with questionable claims would not meet the likelihood of success criterion. See 11A Wright, Miller, & Kane, Federal Practice and Procedure §2948.3, at 184–188 (as a general rule, plaintiff seeking preliminary injunction must demonstrate a reasonable probability of success). The irreparable injury requirement would not be met by unsubstantiated allegations that a defendant may dissipate assets. See *id.,* §2948.1, at 153 ("Speculative injury is not sufficient."); see also Wasserman, 67 Wash. L. Rev., at 286–305 (discussing application of traditional preliminary injunction requirements to provisional asset-freeze requests). As the Court of Appeals recognized, provisional freeze orders would be appropriate in damages actions only upon a finding that, without the freeze, "the movant would be unable to collect [a money] judgment." 143 F. 3d, at 697. The preliminary asset-freeze order, in short, would rank and operate as an extraordinary remedy.

Federal Rule of Civil Procedure 65(c), moreover, requires a preliminary injunction applicant to post a bond "in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined." As an essential condition for a preliminary freeze order, a district court could demand sufficient security to ensure a remedy for wrongly enjoined defendants. Furthermore, it would be

incumbent on a district court to "match the scope of its injunction to the most probable size of the likely judgment," thereby sparing the defendant from undue hardship. See *Hoxworth* v. *Blinder, Robinson & Co.,* 903 F. 2d 186, 199 (CA3 1990); cf. App. to Pet. for Cert. 53a (District Court expressed readiness to modify the preliminary injunction if necessary to GMD's continuance in business).

The protections in place guard against any routine or arbitrary imposition of a preliminary freeze order designed to stop the dissipation of assets that would render a court's judgment worthless. Cf. *ante,* at 327, 332–333. The case we face should be paradigmatic. There was no question that GMD's debt to Alliance was due and owing. And the short span—less than four months—between preliminary injunction and summary judgment shows that the temporary restraint on GMD did not linger beyond the time necessary for a fair and final adjudication in a busy but efficiently operated court. Absent immediate judicial action, Alliance would have been left with a multimillion dollar judgment on which it could collect not a penny.[6] In my view, the District Court properly invoked its equitable power to avoid that manifestly unjust result and to protect its ability to render an enforceable final judgment.

At the hearing on the preliminary injunction, the District Judge asked: "We have got a case where there is no defense

---

[6] Before the District Court, Alliance frankly acknowledged the existence of other, unrepresented creditors. While acting to protect its own interest, Alliance asked the District Court to fashion relief that "does not just directly benefit us, but benefits . . . the whole class of creditors" by creating "an even playing field" among creditors. App. to Pet. for Cert. 46a; see also *id.,* at 45a (Alliance suggests that District Court direct GMD to set up a trust in compliance with Mexican law in order to oversee distributions to creditors). The Court supplies no reason to think that Alliance should have abandoned its rock-solid claim just because other creditors, for whatever reason, failed to bring suit. But cf. *ante,* at 331 ("respondents did not represent all of the holders of the Notes; they were an active few who sought to benefit at the expense of the other [creditors]").

presented, why shouldn't I be able to provide [Alliance] with [injunctive] relief?" App. to Pet. for Cert. 34a. Why, the District Judge asked, should GMD be allowed "to use the process of the court to delay entry of a judgment as to which there is no defense? Why is that equitable?" *Id.*, at 36a. The Court gives no satisfactory answer.

## B

Contrary to the Court's suggestion, see *ante*, at 332, this case involves no judicial usurpation of Congress' authority. Congress, of course, can instruct the federal courts to issue preliminary injunctions freezing assets pending final judgment, or instruct them not to, and the courts must heed Congress' command. See *Guaranty Trust Co.* v. *York*, 326 U. S. 99, 105 (1945) ("Congressional curtailment of equity powers must be respected."). Indeed, Congress has restricted the equity jurisdiction of federal courts in a variety of contexts. See *Yakus* v. *United States*, 321 U. S. 414, 442, n. 8 (1944) (cataloging statutes regulating federal equity power).

The Legislature, however, has said nothing about preliminary freeze orders. The relevant question, therefore, is whether, absent congressional direction, the general equitable powers of the federal courts permit relief of the kind fashioned by the District Court. I would find the default rule in the grand aims of equity. Where, as here, legal remedies are not "practical and efficient," *Payne*, 7 Wall., at 431, the federal courts must rely on their "flexible jurisdiction in equity . . . to protect all rights and do justice to all concerned," *Rubber Co.* v. *Goodyear*, 9 Wall. 788, 807 (1870). No countervailing precedent or principle holds the federal courts powerless to prevent a defendant from dissipating assets, to the destruction of a plaintiff's claim, during the course of judicial proceedings. Accordingly, I would affirm the judgment of the Court of Appeals and uphold the District Court's preliminary injunction.