## In re QWEST COMMUNICATIONS INTERNATIONAL, INC. SECURITIES LITIGATION

Nos. CIV.01–RB–1451(PAC), 01–RB–1472, 01–RB–1527, 01–RB–1616, 01–RB–1799, 01–RB–1930, 01–RB–2083, 02–RB–333, 02–RB–374, 02–RB–507, 02–RB–658, 02–RB–755, 02–RB–798.

United States District Court,
D. Colorado.

Nov. 7, 2002.

---

Robert J. Dyer, III, Kip B. Shuman, Jeffrey A. Berens, John M. Martin, Dyer & Shuman, Denver, CO.

William S. Lerach, Darren J. Robbins, Milberg, Weiss, Bershad, Hynes & Lerach, San Diego, CA.

Seth Aronson, David I. Hurwitz, O'Melveny & Meyers, Los Angeles, CA.

Phillip L. Douglass, Denver, CO.

Marc L. Ackerman, Scott & Scott, LLC, Bala Cynwyd, PA.

Robert N. Miller, Eden C. Steele, Le-Boeuf, Lamb, Greene & MacRae, LLP, Denver, CO.

Ty Cobb, Hogan & Hartson, LLP, Denver, CO.

Kimo S. Peluso, Charles A. Stillman, Michael J. Grudberg, Stillman & Friedman, PC, New York City.

Lee S. Richards, Daniel C. Zinman, Richards Spears Kibbe & Orbe, New York City.

Terry W. Bird, Vincent J. Marella, Mark T. Drooks, Thomas V. Reichert, Bird, Marella, Boxer & Wolpert, Los Angeles, CA.

David Meister, John K. Carroll, Clifford Chance US LLP, New York City.

Penelope A. Graboys, Amy M. Ross, Susan Samuels Muck, Clifford Chance US LLP, San Francisco, CA.

Gary Lozow, Robert D. Connelly, Jr., Blain D. Myhre, Isaacson, Rosenbaum, Woods & Levy, PC, Denver, CO.

David R. Boyd, Kenneth F. Rossman, IV, Jonathan D. Schiller, Boies, Schiller & Flexner, LLP, Washington, DC.

Kirsten E. Gillibrand, Boies, Schiller & Flexner, LLP, New York City.

James Edward Smith, Gilbert & Sackman, Los Angeles, CA.

## ORDER DENYING PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER CONCERNING QWEST COMMUNICATIONS INTERNATIONAL, INC.

BLACKBURN, District Judge.

This matter is before me on the lead plaintiff's Emergency Motion for Temporary Restraining Order [# 155], filed November 4, 2002. I have carefully reviewed the plaintiffs' motion, Qwest's response, the plaintiffs' reply, and the applicable law. For the reasons discussed below, the motion is denied as to defendant Qwest Communications International, Inc.

Both the plaintiffs and Qwest indicate that resolution of this motion with regard to the relief sought against Qwest is urgent because Qwest expects to close the sale of a business known as QwestDex on November 8, 2002. The plaintiffs seek to stop that closing, or to impose a constructive trust on the sale proceeds received by Qwest. The plaintiffs have indicated that they do not consider their request for relief against defendants Joe Nacchio and Philip Anschutz to be as urgent. In the interest of time, I will not address the relief sought against Nacchio and Anschutz in this order. However, I will address the relief sought against Nacchio and Anschutz in the very near future.

This case involves alleged violations of the securities laws by defendants Qwest Communications International, Inc., Joe Nacchio, Qwest's former CEO and Co-Chairman, and Philip Anschutz, Qwest's

former Co–Chairman. Additional defendants are named in the complaint, but the plaintiffs do not seek a TRO as to those defendants. The plaintiffs base their motion for a TRO on their claims against Qwest under § 11 of the 1933 Securities Act. 15 U.S.C. § 77k. Section 11 imposes liability for the filing of a securities registration statement that contains an untrue statement of material fact, and provides for the recovery of damages if a violation is proven. 15 U.S.C. § 77k(a),(e). The plaintiffs assert claims in addition to their § 11 claims, but those other claims are not asserted as the basis for their motion for TRO. In general, the plaintiffs claim that Qwest's false statements about the financial state of Qwest induced them to buy or otherwise acquire Qwest stock. Recent revelations of alleged accounting irregularities have caused the value of Qwest stock to fall substantially. The plaintiffs allege that they have suffered losses as a result.

This is a proposed class action. The proposed class of plaintiffs includes anyone who purchased or otherwise acquired the publicly traded securities of Qwest between May 24, 1999 and February 14, 2002. Included in the class are all persons who purchased or otherwise acquired Qwest securities in connection with the Registration Statements and Prospectuses issued during the class period. This case has not been certified as a class action.

A review of a few basic facts is required to understand the issues presented by the plaintiffs' motion. Qwest acquired U.S. West, a so-called baby bell, in June, 2000. Qwest's acquisition of U.S. West was accomplished with the issuance of new Qwest shares. Qwest traded some of its shares for shares of U.S. West held by U.S. West stockholders in order to acquire U.S. West.

At the time of the acquisition, U.S. West had a telephone directory business. That business produced substantial profits for U.S. West. After the Qwest acquisition, Qwest named the telephone directory business QwestDex. Qwest is financially strapped and is prepared to sell QwestDex for about seven billion dollars. The first stage of the sale, now set to close on November 8, 2002, will net Qwest about 2.75 billion dollars. Under a financing agreement Qwest has with certain lenders, Qwest has agreed to apply $1.4 billion of this amount to an outstanding loan of $3.4 billion owed to those lenders. The second stage of the QwestDex sale, planned to close sometime in 2003, will net Qwest an additional 4.3 billion dollars. The current record indicates that the group of lenders who hold the $3.4 billion loan to Qwest have a security interest in most, if not all, of QwestDex's assets, and in the proceeds of any sale of those secured assets. Qwest's Response, Attachment B (Schaffer Decl.), Exhibit A (Restated Credit Agreement), Exhibit C to Restated Credit Agreement (Security and Pledge Agreement, pp. 17–20).

In their motion for temporary restraining order, the plaintiffs argue that they are entitled to billions of dollars in damages on their § 11 claims, and on their other securities claims against Qwest. They say that the financial survival of Qwest is in question and that Qwest may have to file bankruptcy in the near future. The plaintiffs say they fear that after the QwestDex sales are completed, if "the banks are paid off and the bankruptcy preference period has run, Qwest will file for Chapter 11, shielding itself from liability to the class ..." Pltfs' motion, p. 5. The plaintiffs ask the court to enter a temporary restraining order 1) prohibiting the transfer of QwestDex assets, or 2) freezing and imposing a constructive trust over the QwestDex sales proceeds. The plaintiffs argue that such an order is necessary to ensure the plaintiffs' ability to collect any

judgment they may obtain against Qwest in this case.

### 1. Authority to Impose Injunction

Qwest argues that a federal district court does not have the authority to impose the type of asset freeze injunction sought by the plaintiffs in a case seeking damages for securities violations. The plaintiffs argue that they seek equitable relief in their § 11 claims, and that the court's equitable authority includes the authority to impose the injunction they seek in order to preserve the court's ability to provide effective equitable relief if the plaintiffs establish their § 11 claims.

The court's authority to impose the type of injunction sought by Qwest presents a complex issue that recently has been addressed by the Supreme Court, and other courts. *See, e.g., Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.,* 527 U.S. 308, 119 S.Ct. 1961, 144 L.Ed.2d 319 (1999); *Great–West Life & Annuity Insurance Co. v. Knudson,* 534 U.S. 204, 122 S.Ct. 708, 151 L.Ed.2d 635 (2002); *U.S. ex rel Rahman v. Oncology Assc.,* 198 F.3d 489 (4th Cir.1999); *Newby v. Enron Corp.,* 188 F.Supp.2d 684 (S.D.Tx.2002). However, for the purpose of resolving the current motion, I will not address this issue. Even if I concluded that I have authority to issue the injunction requested by the plaintiffs, I would not issue the injunction based on the analysis of the requirements of Fed.R.Civ.P. 65, discussed below.

### 2. Rule 65 Factors

Assuming without deciding that I have the authority to issue an asset freeze injunction, I conclude that the plaintiffs have not satisfied all of the four key factors that must be proven to support a claim for a TRO or preliminary injunction. A TRO or preliminary injunction is extraordinary relief. A party seeking a preliminary injunction must show 1) a substantial likelihood that the movant eventually will prevail on the merits; 2) that the movant will suffer irreparable injury unless the injunction issues; 3) that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; 4) that the injunction, if issued, would not be adverse to the public interest. *Lundgrin v. Claytor,* 619 F.2d 61, 63 (10th Cir.1980). A party seeking a temporary restraining order must demonstrate clearly, with specific factual allegations, that immediate and irreparable injury will result absent a TRO. Fed. R. Civ. Pro. 65(b).

*A. Substantial likelihood of success on the merits.* The parties dispute whether the plaintiffs have demonstrated a substantial likelihood of success on the merits. For the purpose of this order, I will assume, without deciding, that the plaintiffs have a substantial likelihood of success on the merits of their claims under § 11 of the Securities Act of 1933.

*B. Irreparable injury.* The plaintiffs argue that they will suffer irreparable injury absent a TRO and preliminary injunction because they likely will be unable to recover any money judgment against Qwest absent an injunction. According to the plaintiffs, if Qwest is permitted to sell one of its most valuable assets, the Qwest-Dex business, and to use the proceeds to pay its lenders and for other purposes, there will be little or nothing left for the plaintiffs to collect from when they prove their § 11 securities claims. In essence, the plaintiffs predict insolvency and bankruptcy for Qwest in the near future, but after the sale of QwestDex, and they want assurance that there will be a fund of money or other assets from which the plaintiffs could collect.

Obviously, it is impossible to know what will become of Qwest and the plaintiffs' ability to satisfy any judgment they may

obtain in the future from Qwest's assets. The scenario described by the plaintiffs certainly is plausible. However, it also is plausible that Qwest can continue to operate, and will have assets from which the plaintiffs could collect any judgment they may obtain. Rather than engage this analysis, and this guessing game, I will assume, without deciding, that the plaintiffs may suffer irreparable injury absent and injunction.

■ *C. Threatened injury to plaintiffs versus threatened injury to Qwest.* To justify a TRO and a preliminary injunction, the plaintiffs must show that the threatened injury to them outweighs whatever damage the proposed injunction may cause the opposing party, Qwest. The plaintiffs argue that their inability to collect a judgment for several billion dollars, which they anticipate, is a serious injury. The plaintiffs also argue that freezing the proceeds of the QwestDex sale will not cause significant injury to Qwest. The plaintiffs say that, under their proposed injunction, Qwest would be free to invest the sale proceeds in short term bonds, and would be allowed to petition the court to use these funds to maintain its business operations.

In contrast, Qwest argues that freezing the proceeds of the QwestDex sale will inflict a variety of severe hardships on Qwest. Most notably, Qwest's Chief Financial Officer (CFO), Oren Shaffer, has submitted a declaration describing how Qwest recently has restructured some of its debt, and how the QwestDex sale plays a major part in this restructuring. *Qwest's Response,* Attachment B (Schaffer Decl.). Mr. Shaffer says that Qwest needs the proceeds of the QwestDex sale to satisfy major debt obligations. Schaffer Decl., pp. 3–6. According to Mr. Shaffer, Qwest has no other source of funding to meet these obligations, and Qwest's current financing structure will essentially collapse if Qwest does not have access to the QwestDex proceeds. *Id.*

Further, a group of Qwest's major lenders holds a security interest in most of the QwestDex assets. Schaffer Decl., Exhibit A (Restated Credit Agreement), Exhibit C to Restated Credit Agreement (Security and Pledge Agreement, pp. 17–20). I am very reluctant to interfere with the security interest of a creditor by imposing a TRO on the secured property. In addition, interference with a Qwest lender's security would only serve to enhance the disruption to Qwest summarized above.

On balance, I conclude that the plaintiffs have not shown that the threatened injury they face outweighs the injury Qwest likely would face if the injunction the plaintiffs seek was entered. The proposed injunction would, in essence, likely cause Qwest's current financing structure to collapse. That, in turn, would cause major disruption of the entire Qwest operation and possibly trigger a bankruptcy filing by Qwest. Such injuries to Qwest weigh more heavily than the potential harm the plaintiffs seek to avert. As the plaintiffs note, a bankruptcy filing by Qwest is likely to harm the plaintiffs' interests as well.

■ *4. Public interest.* The plaintiffs argue that there is a strong public interest in enforcing the securities laws, and that their proposed TRO and injunction would serve that interest. They claim that the proposed TRO would not have any significant adverse effect on the public interest. Qwest argues that disrupting their financing structure, and possibly forcing a bankruptcy, is adverse to the public interest for a variety of reasons. These interests include threats to the value of holdings of Qwest shareholders, to the employment of Qwest's many thousands of employees, and possibly to telecommunications services provided to a very large number of people.

On the current record, these potential threats to the public interest are not clearly established, but common sense indicates that a major disruption of Qwest's operations does present some threat to the public interest, primarily in the form of disrupting the operation of a large tele-communications provider. On the current record, I find that the plaintiffs' proposed TRO presents a significant threat of an adverse effect on the public interest.

### 3. Rule 65(c) Bond

Fed.R.Civ.P. 65(c) requires that a party seeking a TRO or preliminary injunction post a bond The plaintiffs argue that they should not be required to post a bond because, under the proposed injunction, Qwest would be able to invest the proceeds and to apply to the court to use the proceeds for operational purposes. The plaintiffs argue that these provisions eliminate any risk of significant harm to Qwest. In the alternative, the plaintiffs argue that any bond should be designed to compensate Qwest for the difference between investing the proceeds in short-term securities versus long-term securities. *Plaintiffs' Reply*, p. 5.

As discussed above, I find that the asset freeze proposed by the plaintiffs likely would cause severe disruption of Qwest's current financing structure and serious disruption of Qwest's operations in general. The potential harm Qwest faces from the proposed injunction is far greater than the difference in interest rates on short-term versus long-term securities. Thus, if the plaintiffs had otherwise established entitlement to an injunction, I still would require them to post a substantial bond to cover these risks.

### Conclusion

**THEREFORE IT IS ORDERED** that the plaintiffs' Emergency Motion for Temporary Restraining Order [# 155], filed November 4, 2002, is **DENIED** as to the relief sought against defendant Qwest Communications International, Inc.