**In re QWEST COMMUNICATIONS IN-TERNATIONAL, INC. SECURI-TIES LITIGATION**

Nos. CIV.A. 01–RB–1472, CIV.A. 01–RB–1527, CIV.A. 01–RB–1616, CIV.A. 01–RB–1799, CIV.A. 01–RB–1930, CIV.A. 01–RB–2083, CIV.A. 01–RB–333, CIV.A. 01–RB–374.

United States District Court,
D. Colorado.

Feb. 6, 2003.

Michael J. Dowd, Milberg, Weiss, Bershad, Hynes & Lerach, LLP, San Diego, CA, Jeffrey Allen Berens, Dyer & Shuman, LLP, Denver, CO, for Plaintiff.

Terence C. Gill, Marcy M. Heronimus, Sherman & Howard, Denver, CO, David R. Boyd, Milberg, Weiss, Bershad, Hynes, San Diego, CA, Alfred P. Levitt, Jonathan D. Schiller, Boies, Schiller & Flexner, Washington, DC, Kirsten E. Gillibrand, Boies, Schiller & Flexner, LLP, New York, NY, Kenneth F. Rossman, IV, Boies, Schiller & Flexner, LLP, Denver, CO, Donald C. McLaughlin, Jr., Steamboat Ski & Resort Corporation Risk Manager, Steamboat Springs, CO, John Frederick Cove, Jr., David W. Shapiro, Boies, Shiller, & Flexner, Oakland, CA, for Defendant.

## ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

BLACKBURN, District Judge.

This matter is before me on the plaintiffs' motion for preliminary injunction [# 155], filed November 4, 2002. Originally, the plaintiffs sought a temporary restraining order and preliminary injunction as to defendants Qwest Communications International, Inc., Nacchio, and Anschutz. In an order entered November 7, 2002, the court denied the plaintiffs' motion for a temporary restraining order as to Qwest. In orders entered November 25 and December 13, 2002, the court denied the plaintiffs' motion for temporary restraining order and preliminary injunction as to defendants Nacchio and Anschutz. On January 28 and 29, 2003, the court conducted a hearing on the plaintiffs' motion for preliminary injunction as to Qwest. For the reasons discussed below, I deny the plaintiffs' motion for preliminary injunction as to Qwest.

## I. FINDINGS OF FACT AND SUMMARY OF CLAIMS

This case involves alleged violations of the securities laws by Qwest and others. The plaintiffs base their motion for a preliminary injunction on their claims against Qwest under § 11 of the 1933 Securities

Act. 15 U.S.C. § 77k. Section 11 imposes liability for the filing of a securities registration statement that contains an untrue statement of material fact and provides for the recovery of damages if a violation is proven. 15 U.S.C. § 77k(a),(e). The plaintiffs assert claims in addition to their § 11 claims, but those other claims are not asserted as the basis for their motion for preliminary injunction. In general, the plaintiffs claim that Qwest's false statements about the financial state of Qwest induced them to buy or otherwise acquire Qwest stock. According to the plaintiffs, recent revelations of alleged accounting irregularities have caused the value of Qwest stock to fall substantially. The plaintiffs allege that they have suffered losses as a result.

This is a proposed class action. The proposed class of plaintiffs includes anyone who purchased or otherwise acquired the publicly traded securities of Qwest between May 24, 1999, and February 14, 2002. Included in the class are all persons who purchased or otherwise acquired Qwest securities in connection with the registration statements and prospectuses issued during the class period. This case has not been certified as a class action.

A review of a few basic facts is required to understand the issues presented by the plaintiffs' motion. Qwest acquired U.S. West, a so-called baby bell, in June, 2000. Qwest's acquisition of U.S. West was accomplished with the issuance of new Qwest shares. In order to acquire U.S. West, Qwest traded some of its shares for shares of U.S. West held by U.S. West stockholders. The plaintiffs seek a preliminary injunction based on the § 11 claims of those members of the proposed class who exchanged U.S. West shares for Qwest shares. These plaintiffs are referred to as the U.S. West exchangers.

At the time of the acquisition, U.S. West had a telephone directory business that produced substantial profits for U.S. West. After the Qwest acquisition, Qwest renamed the telephone directory business QwestDex. In June and July, 2002, Qwest hired a new chairman and chief executive officer, Richard Notebaert, and a new chief financial officer, Oren Shaffer. At the hearing Mr. Shaffer testified that Qwest was in a stressed financial situation when he arrived in the summer of 2002. Mr. Notebaert and Mr. Shaffer undertook immediately to restructure Qwest financially to enable it to continue operating. The restructuring has many facets, three of which are important here.

First, prior to the arrival of Mr. Notebaert and Mr. Shaffer, Qwest was attempting to arrange the sale of QwestDex in an effort to raise cash. Mr. Notebaert and Mr. Shaffer continued this effort. On August 19, 2002, Qwest entered into agreements to sell QwestDex in two stages. The first stage closed in November, 2002, and generated gross proceeds of approximately $2.75 billion for Qwest. The second stage, which is expected to close in 2003, should generate about $4.3 billion in gross proceeds for Qwest.

Second, Qwest renegotiated a $3.4 billion financing package provided by a consortium of 29 banks and other financial institutions. This loan is referred to as the senior credit agreement (SCA). The renegotiation of the SCA extended the maturity date of the loan by two years, until May, 2005. In addition, the renegotiated SCA provides Qwest additional flexibility under the SCA's financial covenants, and explicitly grants the lenders a security interest in QwestDex and the proceeds of the QwestDex sale. Finally, the SCA requires Qwest to pay the lenders $1.34 billion of the proceeds of the first stage of the QwestDex sale, reducing the total principal owed on the SCA to approximately $2 billion.

Third, concurrent with the renegotiation of the SCA, Qwest also obtained a $750 million bridge loan to help finance Qwest's operations pending the completion of the QwestDex sale. Like the SCA, the bridge loan is based on Qwest's current business plan, which assumes that the QwestDex sale will be completed as planned.

Qwest's current business plan and financing structure were outlined at the preliminary injunction hearing. The plan and strategy represent a reasonable response to eschew financial crisis and cannot be characterized as a strategy to hinder or defraud creditors, whether present or prospective. Mr. Shaffer testified about Qwest's current business plan and financial projections through the year 2005. The plaintiffs accepted and relied on his financial information and projections. Assuming that the QwestDex sale is completed, and given Qwest's current debt service obligations, Qwest's current business plan projects that Qwest will have a positive cash balance at the end of each quarter through the second quarter of 2005. Qwest projects that it will have a cash balance of about $1.3 billion at the end of the second quarter of 2003. *Plaintiffs' Exhibit* 138. Qwest projects that it will have a cash balance between $3.37 and $3.53 billion from the end of the third quarter of 2003 through the end of the second quarter of 2004. *Id.* The projected cash balance then begins to fall through the second quarter of 2005, which ends with a projected cash balance of $491 million. *Id.*

If Qwest remains on its current fiscal path, Qwest projects that it will go negative, i.e., face a negative cash balance, at the end of the third quarter of 2005. *Id.* Mr. Notebaert and Mr. Shaffer testified that they intend to improve Qwest's operations over the coming two years to enable Qwest to arrange a revised and improved financial structure before it actually faces a negative cash balance in the third quarter of 2005. I find that Mr. Notebaert and Mr. Shaffer presented credible testimony and an accurate picture of Qwest's current and prospective business plan and financial structure.

In their motion for preliminary injunction, the plaintiffs argue that they are entitled to billions of dollars in damages on their § 11 claims against Qwest. They claim that the financial survival of Qwest is problematic and that Qwest may have to file bankruptcy in the near future. The plaintiffs fear that after both phases of the QwestDex sale is completed, if "the banks are paid off and the bankruptcy preference period has run, Qwest will file for Chapter 11, shielding itself from liability to the class ..." *Plaintiffs' motion,* p. 5. Initially, the plaintiffs asked the court to enter a preliminary injunction freezing and imposing a constructive trust over all of the proceeds of the QwestDex sale. The plaintiffs argued that such an order was necessary to ensure the plaintiffs' ability to collect any judgment they may obtain on their § 11 claims against Qwest.

However, during the hearing on the motion for preliminary injunction, the plaintiffs reduced dramatically the relief requested, asking the court to enter an injunction freezing only $400 million of the QwestDex sale proceeds. Ostensibly, the plaintiffs selected this figure in an effort to limit the harm Qwest would suffer potentially if the plaintiffs' proposed injunction is entered. Thus, the plaintiffs proposed this reduced figure to ensure that the anticipated harm to Qwest did not outweigh the alleged harm to the plaintiffs; thereby enhancing their position vis-à-vis Qwest in the comparative harms analysis required under FED. R. CIV. P. 65 as a prerequisite to injunctive relief.

## II. AUTHORITY TO IMPOSE INJUNCTION

Qwest argues that a federal district court does not have the authority to impose the type of asset freeze injunction sought by the plaintiffs in a case seeking damages for securities violations. The plaintiffs respond that they seek equitable relief in their § 11 claims, and that the court's equitable authority includes the authority to impose the injunction they seek in order to preserve the court's ability to provide effective relief if the plaintiffs establish their § 11 claims. I conclude that I do not have the authority to impose the specific injunctive relief sought by the plaintiffs.

The law established in two recent Supreme Court cases, *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 119 S.Ct. 1961, 144 L.Ed.2d 319 (1999) and *Great–West Life & Annuity Insurance Co. v. Knudson*, 534 U.S. 204, 122 S.Ct. 708, 151 L.Ed.2d 635 (2002), provides significant guidance to the court. In *Grupo Mexicano*, the Court held that a federal court does not have authority to issue a preliminary injunction preventing a party from disposing of assets pending adjudication of a contract claim for damages. *Id.* at 333, 119 S.Ct. 1961. The Court also examined the scope of federal courts' equitable power to impose such asset freeze injunctions in other contexts. The Court noted that a court may have the power to impose an asset freeze injunction in the context of equitable claims under the 1933 Securities Act. *Id.* at 325, 119 S.Ct. 1961 (citing *Deckert v. Independence Shares Corp.*, 311 U.S. 282, 61 S.Ct. 229, 85 L.Ed. 189 (1940)). The plaintiffs rely on the sort of equitable authority outlined in *Deckert* as a basis for their requested preliminary injunction.

In *Great–West Life*, the Court examined equitable relief available under § 501(a)(3) of the Employee Retirement Income Security Act (ERISA). Section 501(a)(3) authorizes courts to provide "appropriate equitable relief" when a plaintiff has proven a violation of an ERISA plan. In *Great–West Life*, the Court concluded that the equitable relief referred to in § 501(a)(3) is limited to "those categories of relief that were typically available in equity . . . ." *Great–West Life*, 534 U.S. at ——, 122 S.Ct. at 712 (citing *Mertens v. Hewitt Assoc.*, 508 U.S. 248, 256, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993)). The Court held that the plaintiff in *Great–West Life* had not asserted a claim in equity, but a claim at law. The plaintiff sought to compel the payment of money past due under a contract, and such relief was not typically available in equity. *Id.* at 713. Absent an equitable claim, the court held that the plaintiff could not seek a preliminary injunction freezing some of the defendants' assets because such relief is available only in equity, and not at law.

One day after the opinion in *Great–West Life* was issued, Judge Rosenthal of the Southern District of Texas issued an order containing a thorough discussion of these issues in the context of securities claims. *Newby v. Enron Corp.*, 188 F.Supp.2d 684 (S.D.Tx.2002). One point made in *Newby* is particularly important here. In order to establish a court's authority to impose an asset freeze injunction based on a plaintiff's equitable claim to the property of a defendant, the plaintiff must assert an equitable claim to the specific property of the defendant. *Id.* at 696 n. 6. The plaintiff's equitable claim must have a "sufficient nexus to the assets sought to be enjoined, before a court may issue a prejudgment injunction freezing or limiting a defendant's use of his assets." *Id.; see also, U.S. ex rel Rahman v. Oncology Assc.*, 198 F.3d 489 (4th Cir.1999).

The nexus requirement in the context of a restitution claim was clearly stated by

the Supreme Court in *Great–West Life.* For "restitution to lie in equity, the action generally must seek not to impose personal liability on the defendant, but to restore to the plaintiff particular funds or property in the defendant's possession." *Id.* at 714–15. A plaintiff can "seek restitution in equity, ordinarily in the form of a constructive trust or an equitable lien, where money or property identified as belonging in good conscience to the plaintiff could clearly be traced to particular funds or property in the defendant's possession." *Id.* at ——, 122 S.Ct. at 714. In short, a plaintiff seeking an asset freeze injunction must have asserted an underlying equitable interest in the particular property that is the subject of the proposed injunction. *See also, Rahman v. Oncology Assoc., P.C.,* 198 F.3d 489, 492 (4th Cir.1999). In other words, a plaintiff seeking an asset freeze injunction must assert an equitable claim, and that claim must have a clear and close nexus to the assets sought to be enjoined.

In the present case the plaintiffs note that they have sought rescission damages and extraordinary equitable and injunctive relief in their prayer for relief. *Fourth Amended Complaint,* p. 136. They argue that these claims for equitable relief give the court equitable authority to impose the injunction they seek concerning the Qwest-Dex assets. They also argue that they have established a nexus between the QwestDex assets, the assets they seek to freeze, and their equitable claims for relief. The plaintiffs note that U.S. West owned the phone directory business before Qwest acquired U.S. West. The group of plaintiffs on whose behalf the injunction is sought, the U.S. West exchangers, owned U.S. West stock prior to Qwest's acquisition of U.S. West. These plaintiffs traded that stock for Qwest stock as part of the acquisition. The plaintiffs argue that Qwest acquired U.S. West, and the business now known as QwestDex, by issuing a false

registration statement, in violation of § 11. According to the plaintiffs, "QwestDex rightfully belongs to the plaintiffs, who were induced by Qwest's false registration statement into exchanging their interest in U.S. West or its underlying assets, including QwestDex, for Qwest stock." *Plaintiffs' reply,* [# 170], filed November 6, 2002, p. 3.

### A. Have the U.S. West Exchangers Asserted an Equitable Claim?

A plaintiff asserting a claim under § 11 may assert a claim "either at law or in equity." 15 U.S.C. § 77k (a). The plaintiffs claim they are entitled to damages, as measured by the formula provided in § 11(e). 15 U.S.C. § 77k (e). Qwest argues that the damages formula provided in § 11(e) is purely legal, and that the plaintiffs' claim for such damages defines their § 11 claim as legal rather than equitable. Section 11, and the 1933 Securities Act generally, provide for broad equitable authority in enforcing their provisions. For the purpose of the motion for preliminary injunction as to Qwest, I assume, without deciding, that the plaintiff U.S. West exchangers § 11 claim includes a claim for equitable relief.

### B. Is There A Sufficient Nexus?

The next question is whether the U.S. West exchangers' putative claim for equitable relief under § 11 has a sufficient nexus to the specific assets sought to be enjoined. The "nexus between the assets sought to be frozen through an interim order and the ultimate relief requested in the lawsuit is essential to the authority of a district court in equity to enter a preliminary injunction freezing assets." *Newby v. Enron Corp.,* 188 F.Supp.2d at 696 (citing *Rahman v. Oncology Assoc.,* 198 F.3d 489, 496—97 (4th Cir.1999)).

[W]hen the plaintiff creditor asserts a cognizable claim to specific assets of the defendant or seeks a remedy involving those assets, a court may in the interim invoke equity to preserve the *status quo* pending judgment where the legal remedy might prove inadequate and the preliminary relief furthers the court's ability to grant the final relief requested.

*Rahman,* 198 F.3d at 496.

I find that the plaintiffs have not established a § 11 claim for rescission or other equitable relief that has a sufficient nexus to the QwestDex assets at issue. The plaintiffs ask the court to "use its preliminary injunction power to ensure a meaningful or effective decision on the merits, especially to prevent defendant from rendering an eventual monetary judgment against it unenforceable." *Plaintiff's motion* [# 155], filed November 4, 2002, p. 17. Section 11(e)'s measure of damages has a flavor of rescission or restitution because it seeks to restore plaintiffs financially to the position they held before buying the security in question. However, nothing in § 11, including § 11(e), gives the plaintiffs who are U.S. West exchangers a specific equitable claim to the particular asset in question here, QwestDex. Although the plaintiffs' § 11 claim may have some equitable aspects, the initial and ultimate relief sought is a money judgment which would compensate the plaintiffs for the losses they suffered, not an order requiring Qwest to restore to the U.S. West exchangers their interest in QwestDex. Nothing in the record indicates that those plaintiffs who were former U.S. West shareholders have a particular or specific equitable claim traceable to the QwestDex assets under § 11. Rather, the QwestDex asset is of particular interest because it has recognized value and it is being sold. In the end, the plaintiffs seek to recover money, not to recover QwestDex. This court does not have the authority to issue an injunction freezing the QwestDex assets because the plaintiffs have not asserted an equitable claim with a sufficient nexus to those assets.

In short, although QwestDex undoubtedly is valuable and might serve as a source of funds from which the plaintiffs could collect, the U.S. West exchangers' § 11 claim is not a claim that they are entitled to have that particular asset restored to them. The nexus between the U.S. West exchangers' § 11 claim and the QwestDex asset is simply too attenuated. Absent a closer and stronger nexus between the claim and the asset, this court does not have equitable authority to enter an asset freeze injunction as to Qwest Dex based on the U.S. West exchangers' § 11 claim.

## III. RULE 65 FACTORS

Even if I did have the equitable authority to issue an asset freeze injunction against the QwestDex proceeds, I conclude that the plaintiffs have not sustained their burden to circumstantiate preponderantly the four key factors that comprise the *sine qua non* for a preliminary injunction under FED. R. CIV. P. 65. A preliminary injunction constitutes extraordinary relief. A party seeking a preliminary injunction must show 1) that there exists a substantial likelihood that the movant will prevail on the merits; 2) that the movant will suffer irreparable injury unless the injunction issues; 3) that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and 4) that the injunction would not be adverse to the public interest. *Lundgrin v. Claytor,* 619 F.2d 61, 63 (10th Cir.1980).

### A. *Irreparable injury.*

█ The plaintiffs argue that they will suffer irreparable injury absent a preliminary injunction because they will be unable to recover a money judgment against

Qwest absent prophylactic injunctive relief. According to the plaintiffs, if Qwest is permitted to sell one of its most valuable assets, the QwestDex business, and to use the proceeds of that sale to pay its lenders and to execute its business plan, there will be little or nothing from which to collect when they prove their § 11 securities claims. Thus, the plaintiffs ask the court to "use its preliminary injunction power to ensure a meaningful or effective decision on the merits, especially to prevent defendant from rendering an eventual monetary judgment against it unenforceable." *Plaintiff's motion* [# 155], filed November 4, 2002, p. 17.

However, at the hearing the plaintiffs reduced the relief requested to an injunction freezing only $400 million in proceeds from the QwestDex sale. The plaintiffs' unsolicited contraction of the purview of relief requested effectively obviated the need for intervention by injunction. This case tentatively is set for a four week trial beginning June 7, 2004. There is no basis to conclude that the trial is likely to be delayed. The undisputed evidence presented at the hearing indicates that Qwest will have a positive cash balance in excess of $400 million through the middle of 2005. Given these unchallenged projections, the record does not support the plaintiffs' claim that they will be subject to irreparable injury absent an immediate injunction freezing $400 million in proceeds from the QwestDex sale. Rather, the record indicates that Qwest will have cash in excess of that amount for about 12 months beyond the anticipated conclusion of the trial of this case. These undisputed facts belie the plaintiffs' claim that they will suffer irreparable injury absent an injunction imposing a constructive trust on $400 million of the proceeds from the sale of QwestDex. With or without preemptive injunctive relief, $400 million should be available to the plaintiffs from which to partially satisfy the prodigious judgment they anticipate.

## B. Threatened injury to plaintiffs versus threatened injury to Qwest.

■ To justify a preliminary injunction, the plaintiffs must show also that the threatened injury to them outweighs the prospective damage to Qwest. The plaintiffs argue that their inability to collect an anticipated judgment of approximately $16 billion on behalf of the U.S. West exchangers constitutes a serious injury. Conversely, the plaintiffs argue that freezing only $400 million of the proceeds of the QwestDex sale will not cause significant injury to Qwest. The plaintiffs note that under their proposed injunction Qwest would be free to invest the sale proceeds in short term bonds, and would be allowed to petition the court to use these funds to maintain its business operations. At the hearing the plaintiffs noted that Qwest anticipates having cash balances well in excess of $400 million through the second quarter 2005. Thus, the plaintiffs argue, limiting Qwest's use of $400 million in the meantime will not prevent Qwest from executing its current business plan.

In contrast, Qwest argues that freezing the proceeds of the QwestDex sale will inflict a variety of immediate and severe hardships on Qwest. Most notably, Mr. Shaffer, Qwest's CFO, described at the hearing and in his declaration how Qwest recently restructured much of its debt. *Qwest's response,* filed November 5, 2002, Attachment B (Shaffer Decl.). Mr. Shaffer testified that the renegotiation of the senior credit agreement and the bridge loan were premised on the successful and unimpeded completion of the QwestDex sale. Mr. Shaffer stated that Qwest needs the proceeds from both stages of the QwestDex sale to satisfy major debt obligations and to fund Qwest's business plan through mid–2005. According to Mr. Shaffer, Qwest has no other source of

funding to meet these obligations, and Qwest's current financing structure will collapse without ready access to the QwestDex proceeds.

Mr. Shaffer testified that Qwest's current business plan is hopeful but fragile. He also testified that if the court froze a substantial portion of the QwestDex proceeds, confidence in Qwest's current business plan would be shaken. He testified that if the court imposed a constructive trust on a significant portion of the QwestDex proceeds there would be a crisis of confidence among banks, suppliers, and customers who are doing business with Qwest currently This lost confidence, Mr. Shaffer testified, very likely would lead to a serious disruption of Qwest's current business plan and probably to bankruptcy. Mr. Notebaert provided similar testimony. I find their testimony to be both credible and logical. To the extent the plaintiffs' witnesses challenged this testimony, I find the testimony of Mr. Shaffer and Mr. Notebaert to be more detailed and persuasive.

Further, a group of Qwest's major lenders holds a security interest in most of the QwestDex assets. *Qwest's response,* filed November 5, 2002, Attachment B (Shaffer Decl.), Exhibit A (Restated Credit Agreement), Exhibit C to Restated Credit Agreement (Security and Pledge Agreement, pp. 17–20). The court continues to be very reluctant to interfere with the security interest of a creditor by imposing a preliminary injunction on secured property. Judicial interference with a Qwest lender's security would only serve to exacerbate and accelerate the disruption to Qwest summarized above.

On balance, I conclude that the plaintiffs have not shown preponderantly that the threatened injury they face outweighs the likely injury Qwest would suffer if the requested injunction were entered. Qwest has made the case that the proposed injunction freezing $400 million of the proceeds of the QwestDex sale likely would cause Qwest's current fragile financing structure to collapse. In turn, the concomitant commercial diffidence would cause major financial disruption ending in bankruptcy. Such probable injuries to Qwest weigh more heavily than the potential harm the plaintiffs seek to mitigate through the imposition of a limited constructive trust of $400 million, which should be available to the plaintiffs without interim injunctive relief. The imposition of injunctive relief in these unsettled circumstances risks financial Armageddon for Qwest on the one hand for imponderous gain to the plaintiffs on the other.

### 3. Public interest.

■ The plaintiffs argue that there is a strong public interest in enforcing the securities laws, and that their proposed preliminary injunction serves that interest. They claim that conversely, the proposed preliminary injunction would not have any significant adverse effect on the public interest. Qwest argues that disrupting their financing structure and forcing a bankruptcy is inherently adverse to the public interest for a variety of reasons. These interests include threats to the value of holdings of Qwest shareholders, to the employment of Qwest's many thousands of employees, to the financial interests of Qwest retirees, to the livelihood of Qwest's suppliers, and to the telecommunications services provided to a substantial population within Qwest's fourteen-state service area.

Common sense indicates that a major disruption of Qwest's operations does present a significant threat to the multifaceted public interest. Qwest employs fifteen thousand people in Colorado alone. It employs thousands of additional employees in each of the thirteen other states it serves.

Qwest also has myriad retirees, suppliers, and customers in these fourteen states. I have concluded that a preliminary injunction freezing $400 million of the proceeds of the QwestDex sale would substantially disrupt Qwest's current business plan and would probably prompt Qwest's bankruptcy. Such events would cause Qwest to lay off many employees, and to reduce its demand for supplies and services from its suppliers. Further, placing Qwest in an even more fragile financial position likely would reduce the value of stock held by employees and retirees, and could implicate the health benefits Qwest provides to its retirees.

All of these foreseeable events are contrary to the public interest. It is not lost upon the court that Qwest has increased its enterprise value subsequent to the denial of the plaintiffs' request for a temporary restraining order. Absent the constraints of the proposed preliminary injunction, which appear to lead almost ineluctably to insolvency and bankruptcy, Qwest has a chance to continue to survive and grow financially to the benefit of all its dependants, *a fortiori*, the plaintiffs. These considerations weigh heavily against the plaintiffs' request for a preliminary injunction and instead, for continuation of the status quo characterized by judicial *laissez faire*. On the current record, I find that the plaintiffs' proposed preliminary injunction presents a significant and unnecessary threat to the public interest.

#### 4. Conclusion.

Considered individually and cumulatively, each of the three factors discussed above weighs strongly against the plaintiffs and renders moribund the preliminary injunction they seek. Given my foregoing findings and conclusions, I need not address other relevant factors. The motion should be denied.

### ORDERS

**THEREFORE IT IS ORDERED** that the plaintiffs' motion for preliminary injunction [# 155], filed November 4, 2002, is **DENIED** as to the relief sought against defendant Qwest Communications International, Inc.