NOT RECOMMENDED FOR PUBLICATION
File Name: 09a0002n.06
Filed: January 6, 2009

No. 07-2126

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| IRWIN SEATING COMPANY, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| INTERNATIONAL BUSINESS | ) | WESTERN DISTRICT OF MICHIGAN |
| MACHINES CORPORATION and J.D. | ) | |
| EDWARDS WORLD SOLUTIONS | ) | |
| COMPANY, | ) | OPINION |
| | ) | |
| Defendants-Appellees. | ) | |
| _____ | ) | |

**Before: BATCHELDER, GILMAN, and SUTTON, Circuit Judges.**

**RONALD LEE GILMAN, Circuit Judge.** In 1999, Irwin Seating Company (Irwin) attempted to implement a new computer system that it had purchased from International Business Machines Corporation (IBM), J.D. Edwards World Solutions Company (Edwards), and SynQuest, Inc. (SynQuest). After the project failed, Irwin filed a complaint seeking damages from the three technology companies based upon various contract, warranty, tort, and statutory claims. None of Irwin's claims survived the defendants' motions to dismiss and for summary judgment. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

**I. BACKGROUND**

**A. Factual background**

The district court thoroughly set out the relevant facts in *Irwin Seating Co. v. IBM*, No. 1:04-CV-568, 2005 WL 1475390 (W.D. Mich. June 22, 2005) (unpublished) (*Irwin Seating I*), and in *Irwin Seating Co. v. IBM*, No. 1:04-CV-568, 2007 WL 2351007 (W.D. Mich. Aug. 15, 2007) (*Irwin Seating II*). We summarize them briefly here.

Irwin manufactures public seating for movie theaters, auditoriums, arenas, performing arts centers, and convention centers. The company's principal place of business is in Grand Rapids, Michigan, but its products are manufactured and sold worldwide. In 1999, Irwin hired IBM to assist in the selection of a new computer system to integrate the various aspects of Irwin's business. IBM recommended a system that it called "Big Tiger." The system consisted of two software packages—OneWorld, produced by Edwards, and Manufacturing Manager, a product of SynQuest. These two programs were to operate on IBM hardware, and IBM would provide implementation services. The three companies engaged in a team effort to market their respective products to Irwin. In meetings and marketing materials, they referred to themselves as "partners" and called their package a "one stop total solution" with "single source accountability."

Irwin eventually decided to purchase the Big Tiger system and proceeded to negotiate contracts with each of the three participants. On June 23, 1999, IBM and Irwin memorialized their agreement in a document titled "Statement of Work" (SOW). The SOW signature page contains the following declaration: "Each of us agrees that the complete agreement between us about these services consists of 1) this SOW, and 2) the IBM Services Agreement (or any equivalent agreement signed by both of us)." Later, IBM and Irwin executed a Project Change Authorization (PCA #1) for the implementation of SynQuest's Manufacturing Manager software. The PCA #1 signature page

2

stated that "[e]ach of us agree that the complete agreement between us about these Services will consist of 1) This Change Authorization, 2) The Statement of Work and 3) The IBM Customer Agreement or any equivalent agreement signed by both of us." The IBM Services Agreement (ISA) and IBM Customer Agreement (ICA) are IBM's master agreements that contain the standard commercial terms between IBM and its customers, including warranty disclaimers and a two-year limitation period for lawsuits filed under the agreements. Irwin and IBM have entered into at least eight contracts that have incorporated the terms of the ICA since IBM began using that agreement in 1991.

Also in June 1999, Irwin entered into contracts to license OneWorld from Edwards and Manufacturing Manager from SynQuest. Following an independent proposal by Edwards, Irwin also licensed a "product configurator" program called Custom Works from Edwards. Edwards represented that Custom Works would be interoperable with OneWorld and would improve the overall usefulness of the Big Tiger system.

According to Irwin, Big Tiger failed completely. The interface between Manufacturing Manager and OneWorld was unsuccessful and the two programs could not exchange information. In addition, IBM never installed a hardware cluster that would have minimized downtime in the event that the Manufacturing Manager program failed. Finally, Irwin experienced substantial problems with the Custom Works program, even after Irwin licensed a second version—the "Beta" version—of the product in December 1999 that included significant custom modifications. Irwin eventually terminated its implementation of Manufacturing Manager in late 2002 and its OneWorld and Custom Works implementation in early 2003.

## B. Procedural history

In August 2004, Irwin filed a six-count complaint in federal district court against IBM, Edwards, and SynQuest. Subject matter jurisdiction in the case rested on the complete diversity of the parties, with Irwin incorporated in Michigan, IBM in New York, Edwards in Colorado, and SynQuest in Georgia. The complaint alleged fraud and fraudulent inducement relating to precontractual representations (Count 1), negligent misrepresentation (Count 2), breach of implied warranty of workmanlike services (Count 3), breach of warranty (Count 4), breach of contract (Count 5), and deceptive trade practices in violation of § 6-1-105 of the Colorado Revised Statutes (Count 6). Irwin's complaint also sought to hold the three defendants jointly and severally liable under a theory that they were partners by estoppel.

IBM and Edwards responded to the complaint by filing motions to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Before those motions were decided, Irwin and SynQuest reached a settlement agreement. SynQuest was subsequently dismissed from the suit. In June 2005, the district court granted the motions of IBM and Edwards to dismiss in part. *Irwin Seating I*, 2005 WL 1475390. The tort claims and the Colorado deceptive-trade-practices claim were dismissed against both defendants, and the warranty claims were dismissed as to Edwards. All that remained were the warranty claims against IBM and the breach-of-contract claims against both defendants. The parties proceeded with discovery. Edwards and IBM then moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, which the district court granted in August 2007. *Irwin Seating II*, 2007 WL 2351007. On appeal,

Irwin challenges the district court's disposition of the tort, warranty, and contract claims, but has abandoned its Colorado deceptive-trade-practices claim.

## II.  ANALYSIS

### A.  Standard of review

We review de novo a district court's dismissal of a complaint for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. *Marks v. Newcourt Credit Group, Inc.*, 342 F.3d 444, 451 (6th Cir. 2003).  In reviewing a Rule 12(b)(6) motion to dismiss, "[f]actual allegations must be enough to raise a right of relief above the speculative level, . . . on the assumption that all the allegations are true (even if doubtful in fact)." *NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 461 (6th Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 1965 (2007)).  "We need not," however, "accept as true legal conclusions or unwarranted factual inferences." *Gregory v. Shelby County*, 220 F.3d 433, 446 (6th Cir. 2000).

A district court's grant of summary judgment is also reviewed de novo. *Int'l Union v. Cummins*, 434 F.3d 478, 483 (6th Cir. 2006).  Summary judgment is proper where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  In considering a motion for summary judgment, the district court must draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

**B. Choice of law**

Because subject matter jurisdiction in this case is based on diversity of citizenship, the district court addressed the issue of which state's law should apply to each of Irwin's various claims. After careful analysis, the district court concluded that Colorado law governed the contract claims against Edwards and Michigan law governed the contract claims against IBM as well as the tort claims against both defendants. The parties do not challenge the district court's choice-of-law conclusions on appeal.

**C. Dismissals pursuant to Rule 12(b)(6)**

*1.      Fraudulent inducement and negligent misrepresentation*

Irwin alleged in the first two counts of its complaint that the defendants made numerous false statements about their products, and that these statements induced Irwin to enter into the Big Tiger contracts. For example, Irwin complained that the defendants had represented that "the proposed Big Tiger system was a 'totally integrated IT solution,'" that Manufacturing Manager could be successfully interfaced with OneWorld, and that OneWorld was "commercially ready, well tested and had been successfully implemented for many other customers."

The district court concluded that Irwin's fraudulent-inducement and negligent-misrepresentation claims against IBM and Edwards were barred by Michigan's economic-loss doctrine. Where "a purchaser's expectations in a sale are frustrated because the product he bought is not working properly, his remedy is said to be in contract alone." *Neibarger v. Universal Coops, Inc.*, 486 N.W.2d 612, 615 (Mich. 1992). This is because parties to a commercial transaction are capable of allocating the risks of economic damages in their agreement. *Id.* at 616. Contract law

6

should thus not be allowed to "drown in a sea of tort." *Huron Tool and Eng'g Co. v. Precision Consulting Servs., Inc.*, 532 N.W.2d 541, 546 (Mich. Ct. App. 1995); *see also Miller v. United States Steel Corp.*, 902 F.2d 573, 574 (7th Cir. 1990) ("[T]ort law is a superfluous and inapt tool for resolving purely commercial disputes.").

Because Irwin seeks recovery for economic loss only, its negligent-misrepresentation claim cannot survive. *See Bailey Farms Inc. v. NOR-AM Chem. Co.*, 27 F.3d 188, 191-92 (6th Cir. 1994) (holding that Michigan's economic-loss doctrine bars recovery through the tort of negligent misrepresentation for economic loss caused by a product purchased for commercial purposes). Nor does Irwin make any arguments in support of its negligent-misrepresentation claim on appeal. It argues, however, that fraudulent-inducement claims fall within an exception to the economic-loss doctrine articulated in *Huron Tool*, 532 N.W.2d at 545 ("Fraud in the inducement presents a special situation where parties to a contract appear to negotiate freely—which normally would constitute grounds for invoking the economic loss doctrine—but where in fact the ability of one party to negotiate fair terms and make an informed decision is undermined by the other party's fraudulent behavior."). But the *Huron Tool* court made clear that there is an exception to this exception, i.e., the economic-loss doctrine does apply to claims for fraudulent inducement if the allegedly fraudulent misrepresentations relate solely to the "quality or character of the goods sold." *Id.*

Because the allegedly fraudulent statements made by the defendants in this case all relate directly to the quality and character of the software Irwin purchased, *Huron Tool* controls the panel's disposition of Irwin's fraudulent-inducement claims. Irwin nevertheless urges us to ignore *Huron Tool*, citing a comment made by a federal court in Wisconsin that "[i]n practice, the *Huron* limitation

7

renders the fraud in the inducement exception a nullity [because it] is so broad that it swallows the exception whole." *Budgetel Inns, Inc. v. Micros Systems, Inc.*, 8 F. Supp. 2d 1137, 1146 (E.D. Wis. 1998).

The above argument cannot save Irwin's fraudulent-inducement claims for two reasons. First and most importantly, *Huron Tool* is the law in Michigan; *Budgetel Inns* is not. In addition, the *Budgetel Inns* reasoning about the purported overbreadth of *Huron Tool* has been persuasively undermined by a subsequent case from the same Wisconsin federal court. That case notes that "[i]t is not difficult to conceive of several scenarios giving rise to claims for fraud in the inducement that survive a challenge under *Huron*." *Rich Products Corp. v. Kemutec, Inc.*, 66 F. Supp. 2d 937, 979 (E.D. Wis. 1999). Such scenarios might include a company's "false[] misrepresent[ation of] its financial condition, or the level of its insurance coverage," or any number of other matters that "do not concern the underlying subject matter of the contract or a party's performance thereunder." *Id.* The misrepresentations complained of by Irwin, in contrast, relate exclusively to the subject matter of its contracts with IBM and Edwards. Irwin's tort claims accordingly cannot survive under the economic-loss doctrine. *See Huron Tool*, 532 N.W.2d at 545.

### 2. *Warranty claims against Edwards*

The district court dismissed Irwin's claims against Edwards for breach of warranty, citing the following disclaimer in the software licensing agreement:

> EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, THERE ARE NO WARRANTIES, EXPRESSED OR IMPLIED, INCLUDING BUT NOT LIMITED TO, THE IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. J.D. EDWARDS MAKES NO WARRANTY, EXPRESS OR IMPLIED, REGARDING ACCESSORY

> SOFTWARE OR ANY MODIFIED PORTIONS OF THE SOFTWARE. J.D.
> EDWARDS MAKES NO WARRANTY AS TO THE ADEQUACY OR
> CAPACITY OF ANY HARDWARE OR THIRD PARTY SOFTWARE TO
> ATTAIN SOME OR ALL OF THE PERFORMANCE OBJECTIVES OF
> CONSUMER.

*Irwin Seating I* at *8. Under Colorado law, this provision effectively disclaimed the implied warranties that would have otherwise applied. *See* Colo. Rev. Stat. § 4-2-316(2) (enumerating the requirements for contractual disclaimers of implied warranties). Edwards did not warrant the interface between One World and SynQuest's Manufacturing Manager in the Big Tiger contract with Irwin, and the integration clause in the contract conspicuously disclaimed "all prior or concurrent proposals and understandings, whether oral or written, and all other communications between the parties relating to the subject matter of [the] Agreement."

Irwin attempts to circumvent the plain language of its contract with Edwards by relying on the case of *Olson Manufacturing Co. v. Roberts*, 280 P.2d 433, 438 (Colo. 1955). That case holds that no form of disclaimer will permit a seller to disclaim the "true nature" of an article that is known to the seller. *Id.* But *Olson Manufacturing* does not apply to Irwin's case because it predates Colorado's adoption of the Uniform Commercial Code. *See* Colo. Rev. Stat. § 4-2-316(2). In addition, the *Olson Manufacturing* disclaimer was provided only *after* the buyer had committed to the purchase. *Id.*

Irwin also relies on *Turnipseed v. Vernon*, No. 03-CV-295, 2006 WL 4128323 (Colo. Dist. Ct. Aug. 28, 2006) (unpublished), but that case is similarly inapplicable here. The *Turnipseed* plaintiff, who bought a car through eBay, was held not to be bound by a written disclaimer that he did not receive until after his payment had been processed by the seller. *Id.* In contrast, Irwin

9

undisputably agreed to Edwards's disclaimer of express and implied warranties when it entered into the contract. We therefore find no error in the district court's dismissal of Irwin's warranty claims against Edwards.

## D. Summary judgment motions

### 1. *Contract and warranty claims against IBM*

The district court granted summary judgment to IBM on Irwin's contract and warranty claims, holding that those claims were barred by the two-year contractual limitations period in the IBM Customer Agreement (ICA) and the IBM Services Agreement (ISA). *Irwin Seating II*, 2007 WL 2351007 at *5-10. Because Irwin filed its complaint more than two years after the claims arose, Irwin concedes that these claims against IBM are barred if either the ISA or the ICA is part of the agreement. Irwin instead argues that neither the ICA nor the ISA was incorporated into the SOW. But the SOW plainly expresses the parties' intent to incorporate either the ISA or "an equivalent agreement signed by both of us." Such incorporation of additional terms into a contract by reference to another document has long been permitted in Michigan, as elsewhere. *See, e.g.*, *Forge v. Smith*, 580 N.W.2d 876, 881 (Mich. 1998) ("Where one writing references another instrument for additional contract terms, the two writings should be read together.").

The parties agree that no signed copy of the ISA has been located. Irwin thus points to language in the ISA that states "[b]y signing below for our respective enterprises, each of us agrees to the terms of this Agreement," and argues that this language creates an independent signing requirement that must be met before the ISA's terms can bind the parties. Nothing, however,

prevented the parties from agreeing to the terms of the ISA by incorporating it by reference into the SOW, which does not require signatures on the ISA in order to make its terms part of the agreement.

Regarding the ICA, the district court held that it was also incorporated into the SOW because its material terms are "equivalent" and because Irwin executed a contract titled "IBM Customer Agreement Signature Page for Attachments" in 1996. The 1996 document states that "[b]y signing below for our respective Enterprises, each of us agrees to the terms of the IBM Customer Agreement and the included Attachments."

After determining that the IBM Customer Agreement Signature Page for Attachments met the SOW's requirement that an "equivalent document" be signed by both parties, the district court found an alternative basis for its conclusion that the terms of the ICA were incorporated into the agreement between the parties. This alternative basis rests on the fact that the PCA #1 constitutes the agreement under which IBM agreed to perform work associated with the integration of Manufacturing Manager with OneWorld. As the district court correctly noted, this work constituted "[t]he gravamen of Irwin's complaint" against IBM. *Irwin Seating II*, 2007 WL 2351007 at *10. The PCA #1 incorporated the ICA with no signature requirement.

Under either theory, the district court properly concluded that no genuine issue of material fact exists as to whether the parties incorporated the two-year limitations period into their agreement via either the ISA or the ICA. The grant of summary judgment in favor of IBM on Irwin's warranty and contract claims is therefore affirmed on the basis of the district court's thorough reasoning in *Irwin Seating II*, 2007 WL 2351007 at *5-10.

### 2.      *Contract claim against Edwards*

We now turn to Irwin's contract claims against Edwards. Irwin's core complaint relates to the inability of the various software programs to interact. Edwards failed to provide an interface between Manufacturing Manager and OneWorld, and Custom Works was unable to effectively exchange information with OneWorld. But Irwin agreed to license Custom Works as a "stand alone suite" that was "not currently provided in a form that is interoperable with . . . OneWorld." Similarly, the OneWorld license agreement disclaimed any prior statements regarding the interface between OneWorld and Manufacturing Manager. Irwin insists that these disclaimers should be ignored, citing the 1955 *Olson Manufacturing* case and the more recent unpublished *Turnipseed* decision in its attempt to hold Edwards to its alleged precontractual promises regarding the interfaces between the various programs. We find persuasive the district court's well-reasoned determination that the parties' written agreement effectively disclaimed any such promises. *Irwin Seating II*, 2007 WL 2351007 at *15-17.

Next, Irwin asserts that Custom Works suffered from internal defects and that Edwards is liable for these problems under the express warranty in the original Custom Works license agreement. The district court, however, concluded that "claims based on the original version of CW appear to be barred by the applicable three-year statute of limitations for Colorado claims under the UCC." *Id.* at *16. Irwin acknowledges that the three-year limitations period applies, but argues that Colorado's "repair doctrine" tolled the running of the limitation period for as long as Edwards was attempting to repair the defect. Edwards's second motion for partial summary judgment, however, raised the statute-of-limitations defense to the breach of warranty claims involving its software. Irwin nonetheless did not brief the repair doctrine or develop a record to support the doctrine's

applicability, and has thus waived the issue. *See Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 319 n.3 (1999) (declining to consider on appeal an argument that "was neither raised nor considered below").

**E. Partnership by estoppel**

Irwin's final argument is that IBM and Edwards are jointly and severally liable for Irwin's losses under the Big Tiger project pursuant to the partnership-by-estoppel doctrine. The district court granted summary judgment to the defendants on this issue because the fully integrated contracts expressly disclaimed liability for the acts of business partners. *Irwin Seating II*, 2007 WL 2351007 at *11-14. We find no error in the district court's analysis on Irwin's estoppel claim.

### III. CONCLUSION

This is a classic case of a commercial venture gone bad. What began with high hopes and lofty assurances ended in abysmal failure. IBM and Edwards protected themselves against the possibility of failure in the written documents; Irwin did not. To the extent that the defendants' alleged oral assurances did not match their written disclaimers, the enduring moral of the story is to "get it in writing." Because Irwin failed to do so, we have little choice but to **AFFIRM** the judgment of the district court.