WILKINSON, Circuit Judge, dissenting:
In no uncertain terms, Congress withdrew from our jurisdiction the authority to enjoin ordinary labor disputes. Yet here we are. The parties before us signed a collective bargaining agreement, which provides for the exclusive resolution of disputes through arbitration without any mention of prior judicial involvement. And yet here we are. In seeking to uphold the preliminary injunction issued by the district court, appellee imbibes to the point where meaning mutates-where "never" means "sometimes" and "arbitrate" means "litigate." I think the trial court's injunction wholly improper, wholly bereft of any statutory or contractual basis, and wholly alien to the efficiencies arbitration is supposed to represent.
Binding arbitration is a step forward from an earlier period of industrial strife. That period featured unpredictable strikes, which disrupted the means of production, and ham-handed management responses, which left lasting resentments in the workforce. Binding arbitration in collective bargaining agreements works to ameliorate these problems. See Complete Auto Transit, Inc. v. Reis , 451 U.S. 401, 417-18, 101 S.Ct. 1836, 68 L.Ed.2d 248 (1981) ("Unions agree to ... no-strike clauses in exchange for the employer's promise to arbitrate disputes arising in contract administration.") (Powell, J., concurring). This arrangement has not brought about perfect harmony in labor-management relations because nothing could do that. What it has done is impart to the resolution of industrial disputes a measure of much-needed regular order. Sadly, the majority's disruption of the arbitral process with injunctions of the sort before us will set back this progress and redound eventually to the detriment of labor and management alike.
I.
Faced with a plainly erroneous injunction, the majority not surprisingly heads for the nearest off-ramp: It holds that an arbitral award in favor of the union has mooted this appeal. Even with its mootness holding, however, the majority cannot resist tipping its hand on the merits, praising the district court's "carefully reasoned" and "evenhanded" opinion in a manner that encourages similar pre-arbitral injunctions of future labor disputes. Maj. Op. at 237.
In all events, the matter is not moot. When it issued the preliminary injunction, the district court required the union to post a $5,000 injunction bond. J.A. 152. As the Supreme Court has explained, even where a party has already lost on the merits, a ruling "that the District Court was without power to issue the preliminary injunction" will give rise to "a claim against the injunction bond" under Federal Rules of Civil Procedure 65(c) and 65.1. Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc. , 527 U.S. 308, 313-14, 119 S.Ct. 1961, 144 L.Ed.2d 319 (1999). This "potential cause of action against the injunction bond preserves our jurisdiction over this appeal." Id. at 314, 119 S.Ct. 1961. It is a live controversy on which the arbitral award simply has no bearing.
*239 The majority suggests that any claim against the bond would be futile because Airgas could not have been damaged by being enjoined from doing something the arbitrator now says it had no legal right to do. See Maj. Op. at 237. But that elides the injunction and the arbitral award. Although a party cannot recover damages for being barred from doing something unlawful, the majority ignores the fact that the injunction in this case was materially broader than the arbitrator's decision. It likely restricted perfectly lawful conduct.
The arbitral award covered only Airgas's "plan to transfer [two specific] functions from its Hyattsville facility to its Montgomeryville and its Linthicum Heights facilities." FMCS No. 170224-53328-1 at 23. The injunction, however, restricted not only the relocation of "functions," but also the relocation of all "equipment or materials" and prohibited Airgas from "[m]aking any reductions in or alterations to staffing" in the relevant portions of its business. J.A. 134. Airgas could well argue, for example, that it was damaged by an inability to hire additional workers or replace outdated equipment despite full compliance with the eventual arbitral result. Given the disjunction between the broad injunction and the much narrower arbitral award, it is altogether premature to call this case moot.
In its eagerness to escape the merits, the majority too hastily rejects another reason the case is not moot: It is capable of repetition yet evading review. While not every appeal of a labor injunction will be mooted by an arbitral award, see Maj. Op. at 237, many can be and will be. The Supreme Court has not required outright impossibility of review in order for a category of cases to satisfy this doctrine. If that were the standard, only a handful would ever qualify. Rather, the doctrine requires that "(1) the challenged action [is] in its duration too short to be fully litigated prior to cessation or expiration, and (2) there [is] a reasonable expectation that the same complaining party [will] be subject to the same action again." Spencer v. Kemna , 523 U.S. 1, 17, 118 S.Ct. 978, 140 L.Ed.2d 43 (1998). The challenged action here was in fact "too short to be fully litigated" prior to arbitration, and as the majority indicates, one need not go far back in our records to find another incident of the same nature. See Int'l Union, UMWA v. CONSOL Energy, Inc. , No. 17-1378 (4th Cir. Nov. 27, 2017). And Airgas surely anticipates that in its manifold business operations it will be "subject to the same action again," or why else would it pursue the issue in this case? Simply put, the capable-of-repetition doctrine is not as demanding as the majority suggests, and the Supreme Court has employed it with some regularity, including in the labor injunction context. See, e.g. , Burlington N. R. Co. v. Bhd. of Maint. of Way Employees , 481 U.S. 429, 436, 107 S.Ct. 1841, 95 L.Ed.2d 381 (1987). I see no reason not to invoke it now.
What we have here bears all the hallmarks of a scam. A district court enjoins a company from doing this or that pending arbitration. Before the lumbering appellate process can weigh in, the arbitrator issues an award. Presto, the case is moot, and there is no way the court of appeals, much less the Supreme Court, can undertake review.
Appellee's effort to shield the trial court's decision from review is, to say the least, unseemly. Of course, a company can always seek a stay of any injunction. But requiring a party not only to litigate the "likelihood of success on the merits" before the trial court, see Winter v. Nat. Res. Def. Council, Inc. , 555 U.S. 7, 24, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008), but also to request an appellate stay, is to immerse it in the *240 very litigation it had bargained to avoid. If nothing else, Airgas should be able to seek costs and fees for being forced to expend funds on a process expressly forbidden by the collective bargaining agreement. After all, the whole attractiveness of arbitration as an alternative dispute resolution mechanism is that it will avoid the encumbrances associated with litigation. In its suggestion of mootness, appellee is doing its best to mire future collective bargaining agreements in litigation, and render not only unreviewable but less worthy the very arbitral process that the injunction, with unwitting irony, professes to "protect." See Int'l Bhd. of Teamsters, Local Union No. 639 v. Airgas, Inc. , 239 F.Supp.3d 906, 913 (D. Md. 2017). Supplementing arbitration with this sort of antecedent litigation is no way to bring about industrial peace.
II.
The district court lacked jurisdiction to issue an injunction in this case. In holding otherwise, the trial court treated congressionally imposed limits on its jurisdiction as mere suggestions to be ignored whenever courts see fit, and effectively installed itself as acting CEO of a private company. Such judicial overreach betrays our most basic constitutional constraints.
It is elementary that the jurisdiction of federal district and circuit courts is within Congress's discretion. Article III provides that the "[t]he judicial power of the United States, shall be vested ... in such inferior courts as the Congress may from time to time ordain and establish." U.S. Con. Art. III § 1. And as the Supreme Court long ago explained, "Congress may withhold from any court of its creation jurisdiction of any of the enumerated controversies." Sheldon v. Sill , 49 U.S. 8 How. 441, 449, 12 L.Ed. 1147 (1850).
In 1932, Congress did just that with respect to labor injunctions. The Norris-LaGuardia Act provides that "No court of the United States ... shall have jurisdiction to issue any restraining order or temporary or permanent injunction in a case involving or growing out of a labor dispute, except in a strict conformity with the provisions of this chapter." 29 U.S.C. § 101.
The legislation's premise was simple. Labor and management should be able to settle their differences in the interest of industrial peace, and should be free to do so without courts getting in the way. Then, as now, Congress quite distrusted judicial interference in this area. See, e.g. , 75 Cong. Rec. 4505 (1932) (explaining how federal courts had engaged in "abuse of the power of injunction"); id. at 4510 ("It is because we have now on the bench some judges-and undoubtedly we will have others-who lack that judicial poise necessary in passing upon the disputes between labor and capital that such a law is proposed."). Judicial predilections surface too often in labor-management disputes. At different times, Congress has been more concerned about courts favoring companies or favoring unions. But the neutral principle of Norris-LaGuardia remains constant: the federal courts have no business enjoining ordinary labor disputes.
In Boys Markets, Inc. v. Retail Clerks Union, Local 770 , the Supreme Court created a "narrow" exception, only where absolutely necessary to protect arbitration, to the general prohibition against enjoining labor disputes. 398 U.S. 235, 253, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970). While that opinion purported to limit its holding to the precise circumstances before it, id. at 253-54, 90 S.Ct. 1583, later decisions expanded the principle, see, e.g. , Gateway Coal Co. v. United Mine Workers of Am. , 414 U.S. 368, 94 S.Ct. 629, 38 L.Ed.2d 583 (1974). So-called " Boys Markets injunctions" in favor of management and "reverse Boys Markets injunctions" in favor *241 of unions became a widely recognized, if textually dubious, practice in the federal courts. See, e.g. , Lever Bros. Co. v. International Chemical Workers Union, Local 217 , 554 F.2d 115 (4th Cir. 1976).
The exception to Norris-LaGuardia carved out in Boys Markets and its progeny did not derive from any statutory text. The Supreme Court did not even assert as much in its original opinion. Of course, "Boys Markets and its progeny ... constitute settled precedent." Maj. Op. at 237. But it is anything but settled that these injunctions would, as the majority would have it, become not the exception, but the rule. If courts must, consistent with Supreme Court precedent, take the highly unusual step of finding jurisdiction where Congress has said there is none, they may do so only in the narrowest of circumstances. That is why this court has said that jurisdiction exists only where the absence of an injunction would "render the arbitral process a hollow formality," Columbia Local, Am. Postal Workers Union, AFL-CIO v. Bolger , 621 F.2d 615, 618 (4th Cir. 1980), or a "futile endeavor," Lever Bros. , 554 F.2d at 118.
There was no showing here that failure to issue an injunction would "render the arbitral process a hollow formality" or a "futile endeavor." Id. The district court found no infirmity in the collective bargaining process. No breakdown in the arbitral process. No unwillingness on Airgas's part to comply with an arbitral award. No threat to industrial peace. This case merely involved a relatively minor relocation of work for business efficiencies and regulatory compliance. Besides the conclusory assertions of the union, the district court had no evidence that arbitration would have failed to render an adequate remedy or that management would have failed to abide by an adverse arbitral decision.
Airgas did not propose to close its plant, sell off its equipment, or liquidate parts of its business. See Lever Bros. , 554 F.2d at 117-18 (plant closure); Local Lodge No. 1266, Int'l Ass'n of Mach. & Aerospace Workers v. Panoramic Corp. , 668 F.2d 276, 285-86 (7th Cir. 1981) (asset sales); Drivers, Chauffeurs, Warehousemen & Helpers Teamsters Local Union No. 71 v. Akers Motor Lines, Inc. , 582 F.2d 1336, 1341 (4th Cir. 1978) (business liquidation). It merely proposed to move some equipment that could be put back, and lay off several employees who could be compensated with reinstatement and/or back pay.
Specifically, Airgas planned to relocate two work segments from its Hyattsville, Maryland facility to nearby operations. Under the proposal, a High Pressure Retesting and Liquid Can Repair segment would move to Airgas's facility in Montgomeryville, Pennsylvania, and a Small Medical Oxygen segment would go up the road to Linthicum Heights, Maryland. The first move would have lowered costs, and the second would have allowed the company to achieve compliance with Department of Homeland Security regulations governing the storage of nitrous oxide gas by creating room for a storage facility in Hyattsville. To achieve these goals, Airgas planned to lay off two Hyattsville employees and transfer some heavy equipment by truck. All told, these changes would affect only one fifth of the work at the Hyattsville facility.
These routine business decisions might be inconvenient to undo. But there is not a scintilla of evidence that they would be irreversible.* Rather, they were well within *242 Airgas's prerogative to run its business as it saw fit during the pendency of arbitration.
A company is entitled to realize efficiencies and manage its business until an arbitral order compels it to do otherwise. If a company cannot even convert its workspace to comply with federal safety regulations, or shift a small part of the work at one facility to another, what can it do? If these modest steps are to be enjoined during the pendency of arbitration, then the company has been divested, in violation of a statute and in the absence of any contractual prohibition, of the very right to run its business. The parties can, of course, agree among themselves to maintain the status quo during arbitration. And if a company does not, it runs the decided risk that it will eventually be found by the arbitrator to have violated the collective bargaining agreement with its attendant consequences. But these are decisions first for the parties, next for the arbitrator, and lastly, if at all, for the courts.
III.
It was bad enough for the trial court to flout Congress's clear denial of jurisdiction, but its transgressions did not end there. By issuing an injunction in this case, the court effectively jettisoned the parties' collective bargaining agreement and rewrote it from the bench. The parties bargained for arbitration. They got litigation. They bargained for an arbitrator. They got a federal judge.
Airgas and Local 639 negotiated and signed a contract with a highly detailed, binding dispute resolution provision. Article 18 of the collective bargaining agreement is unequivocal: "The grievance and arbitration procedure above set forth shall be the sole and exclusive means for the determination of all disputes, complaints, controversies, claims or grievances whatsoever arising pursuant to the terms and conditions of this Agreement." J.A. 40 (emphasis added). In the event of a conflict, the parties agreed that the union would file a grievance within 15 days; the two sides would meet to try to resolve their differences; and, failing that, the parties would submit the grievance to arbitration. Article 18 also provides for numerous deadlines, methods for selecting a mutually acceptable arbitrator, and arbitral procedures. The trial court did not point to a single word in this meticulous document that so much as contemplates a stay pending arbitration or a procedure to "facilitate" the agreed-upon process. Indeed, it would be difficult to expedite arbitration without abandoning Article 18's elaborated scheme. After all, the parties agreed to not just any arbitration, but to the precise "procedure above set forth." J.A. 40.
Until a federal court injected itself as a third party to the contract, the dispute resolution process laid out in the collective bargaining agreement was scrupulously followed. Local 639 complains that Airgas declined to halt the challenged relocation or submit to expedited arbitration. But the union did not negotiate for a collective bargaining agreement that required those things. Such terms are wholly absent from this agreement because the parties chose not to include them. To insert them judicially is an absolute gift to one party to the contract. Courts may consider their judgments in these cases Solomonic. But it is *243 contractual agreements, not regal wisdom, around which private parties ought to be able to order their affairs.
IV.
The trial court's extra-statutory and extra-contractual adventure comes at a serious cost. By gratuitously involving itself in questions of what an arbitrator might decide on the merits, or which remedies an arbitrator might approve, the district court skewed the very process Norris-LaGuardia and the collective bargaining agreement sought to protect. And by derogating the parties' negotiated dispute resolution process, it injected doubt and uncertainty into collective bargaining generally. Injunctions are tricky business. Properly utilized, they are vital bulwarks against violations of law. Improperly imposed, they allow equitable judicial discretion to curtail the liberty that it is our right under law to enjoy. This whole enterprise invites ideological mischief. Time and again, the federal courts have proved ill-suited for enjoining industrial disputes. That is the legislative judgment reflected in the Norris-LaGuardia Act, and the judgment that the district court refused to respect. I cannot endorse its action or the destabilization of collective bargaining that will follow from it. I would reverse the judgment.

For similar reasons, an injunction was inappropriate even assuming that the district court had jurisdiction to issue one. "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Winter v. Nat. Res. Def. Council, Inc. , 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008). Because the normal course of arbitration could have given the union an adequate remedy, there was not a likelihood of irreparable harm here.